Michael GOOTEE and Marlene Gootee, Plaintiffs-Appellants,

v.

COLT INDUSTRIES, INC., A Corporation, Defendant-Appellee.

No. 80–1091.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 17, 1981.

Decided July 14, 1983.

Rehearing Denied Aug. 19, 1983.

Balfour Peisner (argued), Detroit, Mich., for plaintiffs-appellants.

James S. Goulding (argued), Detroit, Mich., for defendant-appellee.

Before JONES, Circuit Judge, WEICK, Senior Circuit Judge, and SILER, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Plaintiffs-appellants, Michael and Marlene Gootee, appeal from a judgment of no cause of action entered in favor of the defendant-appellee, Colt Industries, in this diversity action alleging negligence, breach of warranty and misrepresentation in the design and sale of the Colt .45 automatic. The district court directed a verdict in favor of Colt on the misrepresentation claim and submitted the case to the jury on a "breach of warranty of design" theory. The jury found that Colt had not breached such a warranty and the judgment of "no cause of action" was entered accordingly.

On appeal, ten separate grounds for reversal are raised, both substantive and procedural. We affirm the district court's refusal to grant a directed verdict in favor of the appellant, finding that the issues raised were properly before the jury. We find, however, that the district court erred in directing a verdict on the issue of misrepresentation, in excluding evidence of custom and usage concerning the Colt .45 and in failing to submit the issue of negligent design to the jury. Since this cause is remanded to the district court for further proceedings consistent with this opinion, we

---

* The Honorable Eugene E. Siler, Jr., United States District Court for the Eastern and Western Districts of Kentucky, sitting by designation.

need not reach all allegations of procedural error raised by the appellants; those we do address will be noted where relevant, with appropriate directions for the trial court to follow upon remand.

## I—FACTS AND JUDGMENT BELOW

This action arises out of injuries sustained by Michael Gootee when his Colt .45 automatic discharged, lodging a bullet in his left knee. The accident occurred on December 18, 1972. At that time, Gootee was a union organizer for the Detroit Federation of Musicians. He was employed, *inter alia*, as a security officer for the credit union. Gootee was licensed and authorized to carry a gun and did so while working for the union. For the period immediately preceding the accident, Gootee regularly carried the Colt .45 automatic.

Gootee testified that he normally carried the .45 in a full-cock position with a round in the chamber in order to cut the lag time between a perceived threat and his access to the gun for a possible response. He needed a specially-made holster to carry the gun while in that position. While carrying the .45 in the full-cock position, Gootee kept the safety engaged to prevent accidental firing. Gootee was carrying the gun in this fashion on the morning of December 18, 1972.

Early that morning, Gootee was called into the office of a fellow employee, Mr. Taylor, and asked to show his Colt .45 to yet another employee, Mr. Mormile. Gootee testified that while seated across from Mormile, he took the gun from his holster, removed the manual safety, put his thumb between the hammer and firing pin, and lowered the hammer into what he believed to be the half-cock position. Gootee shifted the position of the gun's hammer because he believed the half-cock was safer than the

full-cock with manual safety when handing it from person to person.[1] When he attempted to hand the .45, butt first, to Mormile, the gun discharged, shooting Gootee in the left knee and causing serious injury.

It appears that the gun was never actually engaged in the half-cock position. Rather, the appellants contend that the gun's hammer had perched on the sear or lip of the notch into which it must lock if it is to be securely in the half-cock. Gootee testified that the gun appeared to be in the half-cock, and that he believed that it was when he attempted to hand it over to his fellow employee.

Michael and Marlene Gootee brought this action seeking damages for the injuries sustained when the automatic fired. They assert a number of bases upon which Colt is allegedly liable for all damages incurred: (1) Colt affirmatively misrepresented through advertising and sales literature that the half-cock was a carrying safety, inducing Gootee to use it as such, thereby causing his injuries; (2) because Colt was or should have been aware that a significant majority of the users of the .45 automatic were army and police personnel who were trained to use the half-cock as a safety, Colt was negligent in continuing to design the gun with a half-cock which was *not* a complete carrying safety; and (3) Colt breached an implied warranty of fitness when it sold the .45 for consumer use since, absent a half-cock safety, it was not reasonably fit for such purposes.

At trial, Gootee testified, basically without objection, regarding the facts surrounding the accident itself. The major controversy centers on the accuracy, sufficiency and relevancy of the evidence which the appellants introduced, and sought to introduce, in support of the three theories upon

1. Gootee testified concerning his belief that when handing the .45 back and forth, there was a real danger in leaving the gun in full-cock with a manual safety. He believed that there was a possibility that the safety might slip or be bumped off, resulting in a full blow to the firing pin, causing the gun to ignite. On the other hand, he believed that transferring the gun while in a half-cock posed no danger, both because he believed the half-cock to be a safety and because it was his understanding that even if the hammer were released from the half-cock position, there would be insufficient pressure to cause firing. Gootee believed that only a *full* blow of the hammer to the firing pin would cause the gun to fire.

which they seek to hold Colt liable for that accident.

As noted, the appellants' misrepresentation claim was based on various alleged affirmative representations which led Gootee to believe that the half-cock was a carrying safety. These representations purportedly appeared as advertisements in gun and sportsman magazines, as instructions in a manual accompanying the .45 which Gootee purchased and as portions of army training manuals which Gootee studied. The appellants were unable to produce copies of the exact advertisements or the manual accompanying the gun when purchased. Gootee, however, did testify that a 1956 version of the Colt manual was substantially identical to the one he received, and did submit copies of the army manuals he claims to have relied upon. These materials all contained the claimed representations. To rebut these claims, Colt submitted copies of manuals and advertisements which were in circulation at the time of the accident and, allegedly, at the time that Gootee purchased the gun, none of which represented the half-cock as a safety.[2]

The district court refused to grant a directed verdict in favor of Colt at the close of the plaintiffs' proof. The issue was raised again at the close of the defendant's case, however, and the court granted the motion with regard to the misrepresentation claim. The court found that the appellants had failed to make a sufficient prima facie showing of misinformation by failing to establish the existence of representations which could be directly tied to Colt *and* shown to have been received by Gootee.

Next, the appellants attempted to establish that Colt had been negligent in designing the gun with a half-cock which operated as it did. The appellants established that though the half-cock when properly in place was a safe position, it was impossible to tell from looking at the gun whether one had properly locked it into that position. The appellants claimed that this design created the possibility of a misfire whenever one attempted to use the half-cock. Additionally, the appellants offered to establish that it was reasonably foreseeable that a Colt .45 user would attempt to place the hammer into the half-cock as a carrying safety because all armed forces and police personnel were trained to use the gun that way. The trial court excluded all evidence on this latter point, however, ruling that use by such parties was irrelevant where Gootee was neither a part of the military nor a police officer when he purchased the .45[3] and where there was no evidence that Colt had instructed either group to use the half-cock as they did.

The district court refused to direct a verdict in favor of either party on the issue of negligence. The court did not, however, submit this precise issue to the jury, giving no instructions on negligence and submitting a jury verdict form which failed to mention negligence as a basis for liability.

Finally, the appellants asserted that Colt had failed to supply a product which was reasonably fit for the purposes intended and, hence, had breached the implied warranty of fitness which accompanies the sale of goods. The appellants argued that a reasonable consumer purchasing a Colt .45 would expect that the half-cock position, on the gun as it was otherwise designed, would operate as a carrying safety. The trial court instructed the jury generally with regard to the warranty theory and submitted the case to the jury on the precise question, "[d]id the defendant breach a

---

**2.** In fact, Colt emphasizes the fact that its literature recommended carrying the gun only when *uncocked* and *unloaded.*

**3.** Gootee, while not a police officer, had been a member of the Detroit Police Reserves from 1965–67. Accordingly, he testified that some of his training in the use of guns, including the .45, had been at the direction of the Detroit police force. This period, however, was significantly before Gootee's purchase of the .45 which caused his accident. Since Colt claimed that the general literature in circulation for civilian users at the time of that purchase did not represent the half-cock as a carrying safety, the district court's ruling is not necessarily inconsistent with Gootee's testimony regarding *earlier* training received.

warranty in designing the Colt .45 handgun?" The jury responded in the negative.

A judgment of "no cause of action" was entered. The plaintiffs appealed, alleging, *inter alia,* the following errors as grounds for reversal of that judgment:

(1) That the district court erred when it directed a verdict in favor of Colt on the issue of misrepresentation.

(2) That the district court erred when it refused to grant a directed verdict in favor of the plaintiffs on the issue of negligent design.

(3) That the district court erred when it refused to admit evidence of custom and usage among military and police personnel relating to the Colt .45.

(4) That the district court erred when it submitted a special verdict form to the jury which required a finding that Colt had breached a warranty in designing the .45 before a verdict could be rendered in favor of the plaintiffs.

## II—THEORIES OF LIABILITY

### A. Misrepresentation—Directed Verdict

[1, 2] In reviewing the grant or denial of a directed verdict, this Court is to apply the same standard as that originally applied by the district court. *Milstead v. International Brotherhood of Teamsters,* 580 F.2d 232 (6th Cir.1978). In diversity cases, federal courts are bound by state law in determining whether there is sufficient evidence to raise a jury question. *Erie v. Thompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Gold v. National Savings Bank of the City of Albany,* 641 F.2d 430, 434 (6th Cir.), *cert. denied,* 454 U.S. 826, 102 S.Ct. 116, 70 L.Ed.2d 100 (1981).

■ The general standard for a directed verdict under Michigan law is whether the evidence is such that, without weighing the credibility of witnesses or considering the weight of the evidence, there is substantial evidence from which the jury could find in favor of the party against whom the motion

is made. In making this determination, the evidence must be viewed in the light most favorable to that opposing party. Only when it is clear that reasonable men could come to but one conclusion from the evidence should a court remove an issue from the jury. *Marietta v. Cliffs Ridge, Inc.,* 385 Mich. 364, 189 N.W.2d 208 (1971); *In re Wood Estate,* 374 Mich. 278, 291, 132 N.W.2d 35, 44 (1965). The doubtful case calls for jury instruction and verdict rather than a verdict by order of the court. *Krugh v. Miehle Co.,* 503 F.2d 121 (6th Cir.1974) (applying Michigan law).

■ The word "evidence" in the context of such a review must be construed as meaning all evidence which properly *should* have been received, placing an obligation on an appellate court to consider rulings excluding evidence offered by the nonprevailing party. *Warner v. Kewanee Machinery & Conveyor Co.,* 411 F.2d 1060 (6th Cir. 1969).

■ We believe that there was sufficient evidence proffered by the plaintiffs in the instant case to raise a jury question with regard to the issue of misrepresentation. Gootee testified that he had relied upon various ads and instruction manuals, including that accompanying the .45 he purchased, which stated that the half-cock *was* a safety. The plaintiffs introduced a history or anthology of the Colt .45 which confirmed that such representations had been made at various points since the introduction of the automatic in 1911.[4] The plaintiffs also introduced a 1956 version of the Colt instruction manual which Gootee claims was identical to that he received, containing the exact representations regarding the half-cock upon which he claims to have relied. Testimony was offered from a retail gun salesman, Mr. Krieger, which arguably would have confirmed that

---

**4.** The parties stipulated to the fact that, other than minor cosmetic changes, there have been no basic changes in the design, structure, func-

tioning and operation of the gun since it was first marketed in 1911.

the Colt literature had at one time represented the half-cock as a safety position.[5]

In addition, the plaintiffs offered evidence attempting to tie Colt to the undisputed representation in army manuals that the half-cock was a safety. The plaintiffs offered to show that it was the regular custom and practice of the army to develop instruction manuals based upon technical specifications supplied by the manufacturer, and that it was the established practice of Colt to oversee or make recommendations to wide-scale users employing their own training literature. The only direct evidence of this practice the appellants could offer was in the context of the preparation of instruction manuals for the M–16 rifle, not for the .45 automatic. Though the appellants' witness offered to testify that, to the best of his knowledge, the same procedure was employed for all weapons, the court excluded all testimony regarding these army practices as irrelevant to the Gootee purchase of the Colt .45.

We recognize that the evidence of misrepresentation is not overwhelming and we note that Colt did introduce clear evidence that no such representations have been made outside of the military context in recent years. This, however, does not justify a directed verdict on the issue. A reasonable jury could very well have credited Gootee's statements, finding that the instruction manual he received *did* contain the representations he claimed they did, and that there were advertisements in the magazines he read which induced him to use the half-cock as a carrying safety. The copy of the 1956 Colt manual and the testimony of Mr. Krieger help substantiate these claims. Similarly, a reasonable jury could have inferred that Colt and the army followed a regular practice in jointly developing the instruction manuals for the .45 automatic.[6] The army manuals offered by the plaintiff would then have been directly relevant to the question of Colt's representations regarding the half-cock position. Were the jury permitted to consider the evidence and the ultimate issue, we find that, viewing the evidence of misrepresentation in the light most favorable to the appellants, the appellants *have* proffered substantial evidence which could support a jury verdict in their favor. At worst, this case is a "doubtful" one, to be resolved by the jury.

## B. Negligence—Directed Verdict

Many of the concerns which have led us to conclude that the district court erred in directing a verdict on the issue of misrepresentation also militate in favor of our conclusion that the district court did not err in refusing to grant a directed verdict in favor of either party on the issue of negligence. The right to put one's case before the jury has been carefully guarded in products liability cases, *see e.g. Crews v. General Motors,* 400 Mich. 208, 253 N.W.2d 617 (1977); *Green v. Volkswagen of America, Inc.,* 485 F.2d 430 (6th Cir.1973), and we believe that that right should be afforded to defendants

---

**5.** The court excluded further testimony on this point, finding a discussion of Colt's purported representations irrelevant in light of the directed verdict already entered—Krieger had been called as part of the plaintiffs' rebuttal case.

**6.** There were a number of significant points which the plaintiffs sought to develop prior to trial via requests for admissions pursuant to Rule 36, Federal Rules of Civil Procedure. The defendant's failure to respond to those requests normally would have been an admission as to all matters therein under the relevant provisions of Rule 36. However, the trial court refused to hold the defendant to these admissions because they were not incorporated in the pretrial order. This ruling was made despite the fact that the plaintiffs had three times moved the court for a ruling on this matter and

the court had done no more than officially postpone a decision thereon based on the defendant's representations that the matter had been previously considered by Judge Feikens. Considering the import of the matters contained in the requests and the clear directives of Rule 36, this procedure appears highly irregular. Upon remand, these issues should be addressed and resolved, giving effect to the purposes embodied in the Rule 36 procedure.

One of the most highly significant requests for admissions dealt with Colt's role in the formulation of these army manuals. An admission in this regard clearly would have relieved plaintiffs of their attempt to establish Colt's involvement via evidence of regular custom or practice.

as guardedly as it is to plaintiffs in this setting.

In addition to the generally strict standard which Michigan has adopted for directed verdicts, there is an even greater emphasis on submitting this type of negligence issue to the jury. By its nature, a finding of negligence or nonnegligence requires a determination regarding the reasonableness of a party's conduct. The Michigan courts have clearly indicated that whether a party has met a standard of reasonable prudence is one for the jury. *See e.g. Marietta v. Cliffs Ridge, Inc., supra; Chaney v. Whiting Corporation,* 100 Mich.App. 108, 298 N.W.2d 681 (1980); *Crowther v. Ross Chemical and Manufacturing Co.,* 42 Mich.App. 426, 202 N.W.2d 577 (1972). In fact, it is well established that, where there is sufficient evidence that a product was a proximate cause of the injury, the reasonableness of that product's design is for the jury to determine. *See Chaney v. Whiting Corp., supra; Elsasser v. American Motors Corp.,* 81 Mich.App. 379, 265 N.W.2d 339 (1978); *Kosters v. Seven-Up Co.,* 595 F.2d 347 (6th Cir.1979); *Krugh v. Miehle Co., supra; Green v. Volkswagen of America, Inc., supra.*

The appellants claim that once they established that the injury would not have occurred were the gun designed differently and that a design change was feasible, they were entitled to a directed verdict on the issue of negligent design. The feasibility of a design change, standing alone, does not establish negligence on the part of the manufacturer. Though the appellants' showing may have avoided a directed verdict against them, it did not justify one in their favor. The evidence produced in the appellants' case *raised* a question of fact for the jury—if such a design change were feasible, whether the defendant was *negligent* in failing to implement it. *Krugh v. Miehle Co., supra; see also Durkee v. Cooper of Canada Ltd.,* 99 Mich. App. 693, 298 N.W.2d 620 (1980). A product design is not *per se* unreasonable merely because an alternate design is possible. We find the district court's denial of the plaintiffs' request for a directed verdict appropriate in the circumstances.

## C. Evidence of Custom and Usage

The district court refused to admit evidence regarding the use of the Colt .45 in the military or in the police force absent evidence that Gootee was trained in the use of *this* .45 as a member thereof *and* that Colt was somehow directly responsible for those training methods. The district court felt that without such proof the practices in the military were irrelevant to the reasonableness of the gun's design for commercial, civilian users in the 1970s. We find this limitation on the development of the plaintiffs' case improper because it effectively excludes a valid theory upon which the plaintiffs are entitled to develop their claims of negligence and breach of warranty.

A manufacturer has a duty to design products that are safe for their intended or reasonably contemplated use, guarding against all unreasonable, foreseeable risk to users. *Coger v. Mackinaw Products Co.,* 48 Mich.App. 113, 210 N.W.2d 124 (1973); *Farr v. Wheeler Manufacturing Corp.,* 24 Mich.App. 379, 180 N.W.2d 311 (1970). "Reasonably anticipated use" in the context of Michigan products liability may also include reasonably anticipated *misuse. Green v. Volkswagen of America, Inc., supra; Graham v. Ryerson,* 96 Mich.App. 480, 491, 292 N.W.2d 704 (1980); *Rutherford v. Chrysler Motor Corp.,* 60 Mich.App. 392, 231 N.W.2d 413 (1975); *Byrnes v. Economic Machinery Co.,* 41 Mich.App. 192, 200 N.W.2d 104 (1972); *Crowther v. Ross Chemical and Manufacturing Co.,* 42 Mich.App. 426, 202 N.W.2d 577 (1972). This is true under both negligence and implied warranty theories. *Elsasser v. American Motors Corp.,* 81 Mich. App. at 385, 265 N.W.2d 339. Crucial inquiries in determining whether a use is foreseeable include whether the use made of the product was a common practice and whether the manufacturer was, or should have been aware, of that use. *Cf. Mach v. General Motors Corporation,* 112 Mich.App. 158, 315 N.W.2d 561 (1982).

In the instant case, the appellants attempted to establish that the use of the half-cock as a safety was the virtually universal practice among users of the Colt .45 and that Colt was, or should have been, aware of that practice. The evidence with regard to military and police training techniques is crucial in this regard. Where there is a heterogeneous market for a product, a regular practice or use among members of a single trade constituting a small fraction of the total users would not necessarily give rise to a duty to warn or protect against dangers from that use to those *not* members of the particular trade. The facts of this case differ markedly from such a situation, however. Those trained by the military or the police represent the vast majority of Colt .45 users.

The plaintiffs attempted to establish that it was the common practice among civilian users to attempt to gain access to information regarding military and police training programs, the only comprehensive programs on the use of the .45 that were in existence. According to plaintiffs' theory, the few civilian users of the .45 which existed either had previously been trained by the military or the police, or had access to the information provided in those training programs and manuals. The fact that Colt advertised the extensive noncivilian use of the .45 as a prime selling point is highly significant. The jury might conclude that by its own marketing scheme Colt induced the overlap in use techniques which the plaintiffs sought to establish.

The plaintiffs attempted to introduce evidence indicating not only that the practice was pervasive but that Colt clearly should have known of its existence. Evidence regarding the extensive relationship (both in duration and volume) between Colt and the army, Colt's possible involvement in the development of the army manuals, and Colt's knowledge of military accidents in Vietnam all bear on the establishment of this crucial element of the plaintiffs' case. Combining these factors with the pointed marketing strategy for the Colt .45 noted above indicates that if such a practice did exist, Colt may very well be chargeable with the requisite knowledge thereof.[7]

The district court repeatedly refused to allow the introduction of evidence regarding the practices of those other than civilian users, finding that military and police practices were irrelevant. Such a stance ignores the evidence offered to the effect that the market for the Colt .45 is almost entirely made up of military users and that those few nonmilitary users may be, partially by Colt's own invitation, affected by the nature of the military practices. Gootee clearly testified that he had been so influenced. General principles in products liability cases must, by necessity, be applied with the nature of the product and the makeup of the market for that product constantly in mind. *Cf. Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir.1968); *Elsasser v. American Motors Corp., supra.* Otherwise, concepts of anticipated use, foreseeable misuse and foreseea-

**7.** The plaintiffs sought before trial to amend their complaint to add a count seeking punitive damages. This count was based on the plaintiffs' claim that the defendant was aware not only that the half-cock was used as a safety, but that it had proved extremely dangerous when used as such, as evidenced by numerous injuries in Vietnam caused by misfiring of the .45. Plaintiffs claim that, in response to these known dangers, Colt amended its advertising and instructions without advising existing owners of the weapon of the danger involved in this virtually universal use of the half-cock. The request to amend was denied without explanation.

While it is true that under Rule 15 of the Federal Rules of Civil Procedure, once the period for amendment as of right has expired, amendments may be made only by leave of the court, the rule provides that leave is to be *freely* given when justice requires. Refusal to permit amendment absent some justification for that refusal generally will be deemed an abuse of discretion. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). *See also,* 6 Wright & Miller, *Federal Practice and Procedure:* Civil § 1484, *et seq.* Upon remand, plaintiffs' request is to be reconsidered. The trial court may then either allow the amendment or explain the basis upon which it refuses to "freely" grant it.

ble, unreasonable risk would have no concrete meaning.

 The court's rulings in this regard impacted upon the plaintiffs' negligence *and* breach of warranty theories. The plaintiffs attempted to establish that it would have been a simple process to design the .45 with a half-cock which was capable of operating as a carrying safety—*i.e.,* one which the user would not mistakenly believe to be in a safe half-cock when it was actually precariously perched on the gun's sear, liable to discharge at any moment. Their negligence theory, therefore, rested on the argument that the defendant had been negligent in designing the half-cock as an imperfect safety feature, in the face of knowledge that it was a common practice among the gun's users to rely on that position as a safety.[8] The evidence of the practice and Colt's knowledge thereof was, thus, crucial to the plaintiffs' negligence claim.[9]

 Similarly, the crux of the plaintiffs' warranty claim turned on the argument that the gun as designed did not comport with a reasonable consumer's expectations and, hence, was not reasonably fit for its intended purposes. Accordingly, the evidence of what consumers expected and were generally exposed to with regard to the operation of the half-cock was essential to the implied warranty theory as well.[10]

We find, therefore, that the excluded evidence was both relevant and critical to the appellants' case and, upon remand, should be presented to the jury.

### D. Special Verdict

The appellants contend that it was error to submit a special verdict form to the jury which required them to answer the question, "[d]id the defendant breach a warranty in designing the Colt .45 handgun?" The appellants claim that the form of the question is impermissibly confusing and that its exclusive use effectively directed a verdict in the defendant's favor on the negligence theory of liability. We agree.

While it is true that in certain products liability cases the distinction between implied warranty and negligence theories becomes blurred, *Elsasser v. American Motors Corp.,* 81 Mich.App. at 385, 265 N.W.2d 339, there is no doubt that the two have traditionally been distinct legal theories under Michigan law, requiring unique elements of proof. *See e.g. Prentis v. Yale,* 116 Mich. App. 466, 323 N.W.2d 444 (1982); *Abel v. Eli Lilly & Co.,* 94 Mich.App. 59, 289 N.W.2d 20 (1979); *Kosters v. Seven-Up Co., supra.*

The Michigan statute combining all products liability cases under a single rubric apparently does not alter most traditional distinctions between the legal theories of liability. *See* M.C.L. § 600.2945, *et seq.*

---

**8.** In *Tulkku v. Mackworth Rees,* 406 Mich. 615, 622, 281 N.W.2d 291 (1979), the Michigan Supreme Court emphasized the danger of supplying a device which appears or purports to be a safety, but which does not fully operate as such:

> An inadequate or defectively designed safety device is the practical equivalent of no safety device. But the inherent danger posed by the inadequate safety device may constitute a greater risk ... than no device at all .... The employee has become "conditioned" to believe that the equipment being used is what it says it is, namely, safety equipment. The employee cannot and should not be required to temper his or her behavior because of a defect about which the employee has no awareness.

**9.** In a products liability action grounded on negligence, a defect is established where the plaintiff can show that the manufacturer failed

to do what a reasonably prudent person would do or did what a reasonably prudent person would not have done under the circumstances. *Dooms v. Stewart Bolling & Co.,* 68 Mich.App. 5, 241 N.W.2d 738 (1976). A reasonably prudent manufacturer must guard against dangers posed by foreseeable use, including misuse, *Graham v. Ryerson,* 96 Mich.App. 480, 292 N.W.2d 704 (1972), and it is for the jury to determine to what extent a risk is foreseeable and must be guarded against. *Casey v. Gifford Wood Co.,* 61 Mich.App. 208, 232 N.W.2d 360 (1975).

**10.** In a products liability suit based on implied warranty, a defect can be established by proof that a product is not reasonably fit for its intended or anticipated uses. *Dooms v. Stewart Bolling & Co., supra at note 8.* The measure of anticipated use in the warranty context largely turns on the reasonable expectations of foreseeable uses of the product in question.

The statute defines "products liability actions" as follows:

> Sec. 2945. As used in sections 2946 to 2949 and section 5805 "products liability action" means an action based on any legal or equitable theory of liability brought for or on account of death or injury to person or property caused by or resulting from the manufacture, construction, design, formula, development of standards, preparation, processing, assembly, inspection, testing, listing, certifying, warning, instructing, marketing, advertising, packaging, or labeling of a product or a component of a product.

M.C.L. § 600.2945. While the Michigan Supreme Court has specifically reserved the question of whether the statute was meant to completely converge all products-oriented actions, whether sounding in negligence or warranty,[11] it appears that the better view is that it did not. The plain language of the statute, though arguably contemplating a single "action" for some purposes, specifically refers to the various "theories of liability" upon which such actions are necessarily premised. The operative sections of the statute discuss the admissibility of certain types of evidence[12] and the applicability of comparative negligence for purposes of reducing a plaintiff's right to recovery. While the statute seeks to assure a uniform application of these rules, it does not appear to otherwise alter the nature of the case which a plaintiff must establish in seeking to hold a manufacturer or seller liable for harm caused by its products.

Several lower state courts which have considered the issue have agreed that the negligence and warranty theories of liability remain separate and distinct.[13] *See e.g. Prentis v. Yale, supra; Abel v. Eli Lilly & Co., supra.* Thus, the implied warranty theory closely resembles notions of strict liability in tort while a negligence theory looks solely to the reasonableness of the manufacturer's actions; plaintiffs offering sufficient proof of both are entitled to clear instructions on each. *Prentis v. Yale, supra.*

The prejudice caused by the failure to fully instruct the jury on each of their theories of liability is compounded by the confusion arising from the precise wording of the jury verdict form. We are hard pressed to understand precisely what is meant by an "implied warranty of design." *Colt* was charged with violating an *implied warranty of fitness* and with *negligent design;* they are distinct bases for liability. An attempt to combine the two under one general theory may have prevented the

**11.** In *In Re Certified Questions, Karl v. Bryant Air Conditioning Co.,* 416 Mich. 558, 331 N.W.2d 456 (1982), the state supreme court held, *inter alia,* that M.C.L. § 600.2949 meant to apply comparative negligence to *all* products liability actions, even though contributory negligence had traditionally not been a defense to actions based on implied warranty. The court began its discussion by noting:

> Our reading of the state statute does not require us to determine whether the Legislature completed the confluence of products liability negligence and implied warranty actions into one cause of action or whether two separate actions remain extant. At 567, 331 N.W.2d 456.

**12.** There appears to be some concern regarding the propriety of legislative pronouncements on the admissibility of evidence. *See In Re Certified Questions, supra* at n. 5. *See also Perin v. Peuler,* 373 Mich. 531, 130 N.W.2d 4 (1964). The validity of those provisions of the statute are not at issue in this case, however, and will not now be considered.

**13.** In *Smith v. E.R. Squibb & Sons, Inc.,* 405 Mich. 79, 91, 273 N.W.2d 476 (1979), the state supreme court explicitly refused to hold that implied warranty and negligence are not separate and distinct actions:

> This opinion is limited solely to its facts. We do not suggest that implied warranty and negligence are not independent causes of action. When the factual issue is the adequacy of the warnings given, the legal standard under either theory is one of reasonable care under the circumstances. Note should be made, however, that *on different facts* it could be prejudicial error *not* to give the implied warranty instruction. See *e.g. Midgley v. S.S. Kresge Co.,* 55 Cal App 3d 67; 127 Cal Rptr 217 (1976) (issue of contributory negligence requires instruction on both negligence and strict liability).

*See also In Re Certified Questions, supra* at n. 4.

jury from fully and properly considering either. A reasonable juror could have concluded that the use of the half-cock as a safety was a misuse which Colt, once aware of the practice, may have been negligent in failing to design against, but that Colt had not "breached a warranty" by designing the gun in the first instance. Similarly, while a juror may have found that the gun was not reasonably fit for consumer use, he or she may not have equated that conclusion with a determination that Colt had breached a *warranty in designing* the .45. While it is true that the adequacy of a court's instructions turns on whether they *as a whole* properly and accurately state the applicable law, *King v. Daly,* 2 Mich.App. 116, 126–27, 138 N.W.2d 489, 499 (1965); *Bezemek v. Crystal,* 27 Mich.App. 36, 183 N.W.2d 414 (1970), our review of the instructions in their entirety does not reveal a sufficiently complete statement of the relevant theories of liability to warrant a conclusion that the confusion inherent in the verdict form was harmless.

The district court refused to alter the verdict form on the ground that the plaintiffs had acquiesced by not objecting to its use when the court first gave both parties an opportunity to do so. Without commenting in detail on the severely-limited time period allotted to the development and review of the instructions in this case, we note that the objections to the verdict form were timely within the terms of Rule 51, Federal Rules of Civil Procedure [14] and that we believe they should have been entertained by the court. In addition, our review of the transcript reveals that the court continually referred to the plaintiffs' negligence theory as the central issue in the case and that, until the special verdict was read, the plaintiffs had no clear indication that the court was to abandon that theory when submitting the case to the jury.

Accordingly, we find that upon remand the plaintiffs are to be entitled to clear, distinct instructions regarding each and every separate theory of liability which their proofs adequately raise.

### III—OTHER ALLEGATIONS OF ERROR [15]

We decline to consider in detail the various procedural errors which the appellants assert occurred throughout the course of the trial and pretrial proceedings; we are confident that to the extent that any prejudice to either party did occur, that effect will be remedied upon retrial. We note that the picture of bias and prejudice which the appellants attempt to paint is unsupported by the transcript and record of the proceedings below. In fact, it appears that, but for the court's erroneous limitations on

---

**14.** Rule 51 provides in pertinent part:
 ... No party may assign as error the giving or failure to give an instruction, unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.
The transcript reveals that the verdict form was strenuously objected to *before* the jury retired in this case.

**15.** The six remaining allegations of error are as follows:
 (5) that the district court erred when it refused to permit the plaintiffs to amend their complaint and add a count for punitive damages.
 (6) That the district court erred when it refused to accept a pretrial statement unless signed by both parties, and once signed, refused to allow the plaintiffs to supplement it.

 (7) That the district court erred by inflexibly enforcing the finality of the pretrial statement against the plaintiffs and not against the defendant.
 (8) That the district court erred in limiting the scope of the testimony of the plaintiffs' experts.
 (9) That the district court erred when it set requirements for the pretrial statement which were impossible to meet.
 (10) That the district court erred when it refused to rule that Colt had made numerous admissions by its failure to respond to plaintiffs' request for the same.
We have dealt with the gist of those errors raised in numbers 5 and 10 above in footnotes 6 and 5, respectively. As noted, we believe that the allegations in numbers 6–9 can be adequately dealt with upon remand and need not be examined by this Court.

the plaintiffs' proof (based on a misperception of its relevance and *not* on bias against the plaintiffs), the district court made every effort to allow the plaintiffs to develop their case and explain the theory upon which they were attempting to rely. There is no consistent pattern of rulings in favor of one party or the other; we have no doubt that the district court carefully weighed the *merits* on the issues presented and we would not reverse the judgment in this case on the appellants' allegations of procedural error and prejudice alone. As noted, we are confident that upon remand all parties will receive a fair opportunity to present their case, consistent with a flexible application of all procedural and evidentiary rules.

Accordingly, we reverse the judgment entered by the district court and remand this cause for further proceedings not inconsistent with this opinion. We, of course, reflect no opinion regarding the merits of the appellants' arguments. Similarly, we pass no judgment regarding the degree to which the appellants' ability to recover damages may be limited by Gootee's own negligence, if any, in handling the Colt .45.[16]

REVERSED and REMANDED.

## ORDER

The appellee, Colt Industries, Inc., has petitioned for a rehearing of the above-captioned appeal. The appellee first points to the Court's references to various pretrial proceedings, contained in footnotes 6 and 7 of the opinion. As is obvious from the continuing dispute over the record at this stage (reflected in the petition for rehearing and the appellants' response thereto), the record before this Court on appeal was far from clear. Footnotes 6 and 7 deal with certain serious objections raised to the proceedings, while recognizing that there was some doubt as to the exact nature of those proceedings. To the extent that there are directives contained in those footnotes, the district court is simply directed to consider the issues in light of all relevant concerns and to clarify its treatment of them *on the*

*record.* There is no mandate that the district court reverse its decisions in this regard, provided such decisions were justifiable in the first instance. Appellee's discussion of the record in relation to these issues, even if accurate, would, thus, not warrant a rehearing under Rule 40, Federal Rules of Appellate Procedure.

In addition, the appellee objects to the Court's discussion of the evidence pertaining to military and police training techniques and manuals. We are unconvinced that our original position on this issue is erroneous, either under Rule 401 or Rule 403 of the Federal Rules of Evidence and find nothing of substance in the appellee's discussion of the issue which would justify a rehearing in this case.

Accordingly, the panel is of the unanimous opinion that the petition for rehearing in this case should be and is hereby DENIED.