767 F.2d 919
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
THE DETROIT LIONS, INC., A CORPORATION, AND BILLY SIMMS,
PLAINTIFFS-APPELLEES, CROSS-APPELLANTS,
v.
JERRY A. ARGOVITZ, INDIVIDUALLY AND AS PRESIDENT OF HOUSTON
GAMBLERS, INC., A CORPORATION, THE ARGOVITZ-LERNER-LUBETKIN
JOINT VENTURE, THE HOUSTON USFL FOOTBALL PARTNERS, LTD., A
LIMITED PARTNERSHIP, ARGOVITZ CLINIC ATHLETIC DIVISION,
INC., A CORPORATION, AND ARGOVITZ CLINIC MANAGEMENT
DIVISION, IND., A CORPORATION, DEFENDANTS-APPELLANTS, CROSS-APPELLEES.
 NOS. 84-1360, 84-1368
 United States Court of Appeals, Sixth Circuit.
 6/6/85
 
 E.D.Mich., 580 F.Supp. 542
 AFFIRMED IN PART AND REMANDED IN PART
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
 BEFORE: JONES and KRUPANSKY, Circuit Judges; and EDWARDS, Senior Circuit Judge.
 Per Curiam.
 
 
 1
 This is a cross-appeal from a judgment by which the district court rescinded a contract to play football executed between Billy Sims and the Houston Gamblers, a United States Football League (USFL) franchise. The district court found that the contract resulted from an unconscionable breach of a fiduciary duty by Sim's agent Jerry Argovitz, who was also partial owner of the Houston Gamblers. On this appeal, Argovitz assigns numerous errors in the district court's findings of fact. The Detroit Lions and Sims primarily appeal the district court's denial of two motions to amend their complaints. Upon review of the issues before us, we affirm the district court's rescission of the contract and remand the case for consideration by the district court of two motions to amend the Detroit Lions' and Billy Sims' complaints.
 
 
 2
 In 1980 the Detroit Lions, a National Football League franchise, drafted Sims and signed him to a four-year contract that expired on February 1, 1984. Argovitz entered into an agency agreement with Sims early in 1980 and counselled him on numerous matters. Sims and Argovitz developed a confidential relationship in which, Argovitz testified, Sims looked up to him like a father. Sims sought Argovitz's advice on significant professional, financial, and personal matters.
 
 
 3
 From April 1982 through June 1983, Argovitz negotiated with the Lions for a renewed contract with Sims. On May 5, 1983, Argovitz announced at a press conference that his application for what became the Gambler's franchise had been approved. Sims was present at the press conference. The district court found that Argovitz manipulated Sims' contract negotiations with the Lions during the spring of 1983 in light of Argovitz's own interest in the Gamblers. The court also found that Argovitz misrepresented the negotiations with the Lions as not progressing when in fact they were progressing well. Sims received information on the Lions' negotiations only from Argovitz, the court found. During May or June, 1983, Argovitz decided to seek a contract for Sims with the Gamblers. On June 29, 1983, Sims arrived in Houston, believing that the Lions were not negotiating in good faith and were not really interested in his services. On June 30, 1983 the Gamblers offered Sims a $3.5 million, five year contract that included nonmonetary fringe benefits Sims valued greatly. Argovitz told Sims that he thought the Lions would match the Gamblers' financial package and offered to telephone them. Although Sims told Argovitz not to call the Lions, the district court found that to have two teams bidding for a single athlete is 'the dream of every agent,' and that Argovitz breached his fiduciary duty to Sims by not following the common practice described by both expert witnesses of informing the Lions of the Gamblers' offer. On the afternoon of June 30, while negotiations were proceeding, the Lions' attorney called Argovitz. Argovitz was present at his office, but declined to accept the call. Argovitz attempted to return the call only after 5:00 p.m., when the Lions' attorney had left for the July 4th weekend. The district court found these actions to further breach Argovitz's fiduciary duty towards Sims. Argovitz then left for the holiday weekend. The next day, July 1, 1983, Sims signed an exclusive contract with the Gamblers.
 
 
 4
 In July 1983, uninformed by anyone of these events, the Lions sent Sims a further offer through Argovitz. On November 12, 1983, at Argovitz's instigation, Sims met with him and reexecuted the Gamblers' contract. Sims also signed a waiver of any claim he might have against Argovitz. Although at this time Argovitz had sold his agency business and no longer represented Sims, Argovitz did not inform Sims' new agent of his intention to have Sims sign a waiver. Nor did Argovitz, despite his fiduciary relationship with Sims, advise Sims to seek independent advice before signing the waiver. On December 16, 1983, Sims executed a second exclusive contract with the Lions for $1 million more than his Gamblers' contract.
 
 
 5
 On December 18, 1983, the Lions and Sims brought this suit in Michigan state court against Argovitz and the Gamblers seeking rescission of the Gamblers' contract with Sims. After an evidentiary hearing, the district court found that it had subject matter jurisdiction on the basis of complete diversity of citizenship. Argovitz and the Gamblers challenge this finding on the ground that Sims' domicile was Texas, and complete diversity is lacking. A person's domicile determines his citizenship for diversity purposes. Kaiser v. Loomis, 391 F.2d 1007, 1009 (6th Cir. 1968). The location of a person's domicile at any given time is a question of intent: what is the fixed location to which he intends to return when he is elsewhere? Mas v. Perry, 489 F.2d 1396, 1399 (5th Cir.), cert. denied, 419 U.S. 842 (1974). As such, determination of domicile is primarily a question of fact, that will not be reversed unless clearly erroneous. Holmes v. Sopuch, 639 F.2d 431, 434 (8th Cir. 1981) (Per Curiam). See also Hawes v. Chub Ecuestre El Comandante, 598 F.2d 698, 702 (1st Cir. 1979). The relevant time at which to determine citizenship and one's intent to remain domiciled in a given state is the time suit is filed. Napletana v. Hillsdale College, 385 F.2d 871, 872 (6th Cir. 1967). During the four years preceeding this controversy Sims was employed in Michigan, owned and resided in a home there. He also owned a ranch in Hooks, Texas. No evidence emphasized by the appellants establishes a definite and firm conviction in our minds that the district court erred when it found that Sims' domicile was Michigan at the time of this suit. Argovitz and the Gamblers simply ask this court to reweigh the evidence on a cold record.
 
 
 6
 The district court found that it had personal jurisdiction over Argovitz individually and over the numerous partnerships and corporations that he represented as an agent. Michigan's long arm statutes provide for personal jurisdiction over individuals, partnerships, and corporations that transact business in the state. See M.C.L.A. Secs. 600.701, 600.721, 600.725, 600.715. The goal of Michigan's jurisdictional statutes is to reach 'the outer limits of personal jurisdiction consistent with due process.' Speckine v. Stanwick International, Inc., 503 F. Supp. 1055, 1057 (W.D. Mich. 1980). Due Process requires 'certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). Under Hanson v. Denckla, 357 U.S. 235 (1958), the defendants must have availed themselves of the privilege of conducting business in the forum state. Most recently the Supreme Court has emphasized forseeability as critical: 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.' World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Argovitz had conducted business in Michigan for over three years as the agent of Sims, a Michigan citizen. He was acting on behalf of his player representative organizations in doing so. The Houston Gamblers defendants contracted with Billy Sims as an attraction for their football team, which planned to use his contracted services in football games conducted in Michigan under USFL auspices and contracts. The contract between Billy Sims and the Gamblers was negotiated and signed in Texas, but it certainly was to be performed in part in Michigan. The district court was not in error.
 
 
 7
 The district court granted rescission of the contract between the Gamblers and Sims because it found that Argovitz had breached his fiduciary duty as Sims' agent and confidant. It is uncontested that Argovitz had a personal interest in Sims contracting with the Gamblers, who as a new team in a new football league would greatly benefit from the star attraction of a player of Sims' caliber. Argovitz's self-dealing arose from this conflict with his fiduciary duty to advance Sims' best interests.
 
 
 8
 As the district court found, under Texas law, where an agent has an interest adverse to that of his principal in a transaction in which he purports to act on behalf of his principal, the transaction is voidable by the principal unless the agent disclosed all material facts within his knowledge that might affect the principal's judgment. Burleson v. Earnest, 153 S.W.2d 869, 874-75 (Tex. Civ. App. 1941). This remains true even if the contract is fair. Id. The district court found as a matter of fact that '[a]t no time prior to December 1, 1983, was Sims aware' of all material facts regarding Argovitz's involvement with the Gamblers and Argovitz's failure to pursue Sims' interests in negotiations with the Lions. Argovitz accepts the legal standard as defined by the district court. He maintains that he satisfied his duty of disclosure simply by telling Sims that he was partial owner of the Gamblers and by telling Sims that the Lions would match the financial elements of the Gamblers' offer. A review of the facts as found by the district court reveals that these are but a few of the material disclosures that Argovitz should have made. The district court was not clearly erroneous.
 
 
 9
 Argovitz maintains that rescission of the contract, an equitable remedy, is improper for a number of reasons having to do with Sims' behavior during 1983. The key to these issues is that the district court found as a matter of fact that Sims was not aware of all material imformation concerning his contract with the Gamblers until at least December 1983. Argovitz and the Gamblers do not point to evidence of behavior by Sims that would render the district court's factual findings clearly erroneous.
 
 
 10
 The district court denied the Lions' and Sims' motions to amend their complaints without explanation, and in one case without making an explicit ruling. Such action represents an abuse of discretion under Foman v. Davis, 371 U.S. 178, 182 (1962). See also Gootee v. Colt Industries, Inc., 712 F.2d 1057, 1065 n.7 (6th Cir. 1983). The district court should reconsider the motions to amend in light of the standards of Foman, which looks to considerations such as undue delay, bad faith, and futility of the amendment. Id. if, on remand, the district court denies leave to amend, it should state its reasons for doing so.
 
 
 11
 Therefore, the district court's rescission of the contract between Billy Sims and the Houston Gamblers is AFFIRMED. The matter is REMANDED for consideration of the motions to amend the Lions' and Sims' complaints.