780 F.2d 1021
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
(The decision of the Court is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter.)
GEORGE JABBOUR, Plaintiff-Appellant,
vs.
CATERPILLAR TRACTOR COMPANY, A FOREIGN CORPORATION,
Defendant-Appellee.
 84-1630
 United States Court of Appeals, Sixth Circuit.
 11/18/85
 
 VACATED AND REMANDED
 E.D.Mich.
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION
 Before: JONES and WELLFORD, Circuit Judges; and HOGAN,* Senior District Judge.
 PER CURIAM.
 
 
 1
 George Jabbour appeals from a judgment dismissing his product liability claim following a directed verdict for the defendant. The district court found that the defendant did not manufacture, design, or inspect the mechanism that assertedly caused Jabbour's injuries and that there was no relationship between defendant Caterpillar Tractor Company and the manufacturer upon which to premise Caterpillar's liability. On appellate review of a directed verdict, this Court is to apply the same standard as a trial court. Under Michigan law, the standard is 'whether the evidence is such that, without weighing the credibility of witnesses or considering the weight of the evidence, there is substantial evidence from which the jury could find in favor of the party against whom the motion is made.' Gootee v. Colt Industries, Inc., 712 F.2d 1057, 1062 (6th Cir. 1983) (citing Marietta v. Cliffs Ridge, Inc., 385 Mich. 364, 189 N.W.2d 208 (1971)). In making this determination, the evidence must be viewed in a light most favorable to the party opposing the motion, and only when it is clear that reasonable minds could come to but one conclusion should the case be taken away from the jury. Id. Applying this standard to the instant case, we conclude that the case should have been submitted to the jury.
 
 I.
 
 2
 At the time of trial, George Jabbour was forty-two years of age and a resident of Michigan. He is Lebanese by birth, but has lived in the United States since 1970. Mr. Jabbour was employed by the Ferro Manufacturing Company as an industrial electrician from March of 1979 until he suffered the injury which precipitated this lawsuit. On October 20, 1980, the maintenance superintendent asked Mr. Jabbour to check an electric motor in a heater hanging from the ceiling of the shipping and receiving building. To reach the heater, which was suspended approximately ten feet above the floor, Mr. Jabbour was raised on a wooden pallet clamped to the forks of a 'Hi-Lo' forklift. After Mr. Jabbour had located the problem with the heater, he asked the forklift operator to lower him to the ground. Shortly thereafter, the forks fell to the ground, carrying the pallet and Mr. Jabbour with them and causing serious and permanent injuries to Mr. Jabbour's right foot. Since the accident, Mr. Jabbour has had several operations and numerous casts, and he has been unable to find employment as an electrician.
 
 
 3
 Although both Mr. Jabbour and a fellow Ferro employee described the forklift as a 'Caterpillar Hi-Lo forklift' it was actually manufactured by the Towmotor Corporation. A red cylinder placed on the forklift contains the words 'made by' Towmotor Corporation. Towmotor is a wholly-owned subsidiary of the Caterpillar Tractor Company. On that same cylinder, in much larger print, is the name 'Caterpillar'. The names 'Caterpillar' and 'Cat' and the disjointed letter 'C' logo are all registered trademarks of the Caterpillar Tractor Company. The invoice documenting the sale of such a vehicle refers to it as a 'Caterpillar Lift Truck.' Three booklets that accompanied the forklift when it was sold to Ferro from an independent dealer contain no mention of the Towmotor Corporation, but are emblazoned with the trademarks 'Caterpillar', 'Cat', and the 'C' logo. The 'Operator's Guide' booklet contains this sentence: 'The paragraphrased Safety Rules and Regulations in this section comply with the Occupational Safety and Health Act, as we interpret them when applied to Caterpillar Lift Trucks.' The 'Lubrication and Maintenance Guide' booklet states: 'All Caterpillar-built internal combustion engine equipped lift trucks are negative (-) ground.' Pictures in these booklets depict the trademarks on the mast of the truck, the engine compartment housing, the radiator housing, the battery, and the oil filter.
 
 
 4
 Defendant's expert, Thomas R. Lajeunesse, testified that he was an employee of the Towmotor Corporation, that the stock he purchased through his employee stock plan was that of the Caterpillar Tractor Company, and that his pension upon retirement will be paid by Caterpillar. Mr. Lajeunesse further stated that the Towmotor Corporation manufactures only vehicles that bear the Caterpillar trademarks. In response to a question from plaintiff's counsel 'does Caterpillar have any passage on the design and quality of the vehicle produced by your company?', Mr. Lajeunesse replied:
 
 
 5
 They certainly influenced us, particularly in terms of quality. They have one of the finest quality control programs that I know of in the world, and we have instituted most of their quality control procedures where applicable to our manufacture of our products. Now, they also do assist us in certain design areas, but not in the area of mast design.[1]
 
 
 6
 Despite the wording on the red cylinder on the forklift, and the fact that plaintiff's expert had photographed the cylinder prior to the filing of plaintiff's lawsuit, plaintiff sued only the Caterpillar Tractor Company and did not name the Towmotor Corporation as a defendant. In its answer to the complaint, defendant did not expressly deny that it had manufactured or designed the forklift that injured George Jabbour. However, both parties were made aware that the identity of the manufacturer and designer of the forklift was a contested factual issue at a final pretrial conference conducted by the District Judge. The final pretrial order filed in June of 1983 clearly states the issue. On October 11, 1983 the plaintiff served his first interrogatories on the defendant and asked, albeit still indirectly, who manufactured the forklift; defendant replied: 'The lift truck was not built by Defendant Caterpillar, but by Towmotor Corporation on May 16, 1977.'
 
 
 7
 By the time the case went to trial in May of 1984, the issue was clearly joined. After hearing all the plaintiff's evidence and one witness presented for defendant, the Court decided the cross motions for directed verdict presented, and, on the very narrow ground that there was no evidence that Caterpillar had any control over or input into Towmotor's design and manufacture of the particular part that allegedly proved defective, concluded that Caterpillar could not be held liable to Mr. Jabbour. The trial court therefore granted Caterpillar's motion for directed verdict.
 
 
 8
 On appeal, Mr. Jabbour assigns two claimed errors: 1) the holding that defendant Caterpillar did not admit manufacture and design of the forklift in its answer to plaintiff's complaint; and, 2) the grant of defendant Caterpillar's motion for directed verdict.
 
 II.
 
 9
 Plaintiff claims either that Caterpillar expressly admitted manufacture and design in its answer to plaintiff's complaint or that, because of its denial based on lack of knowledge, it should be deemed to have admitted it. The trial court concluded that defendant did not expressly admit that it manufactured or designed the forklift. Taking the pleading as a whole, we agree.
 
 
 10
 As to the alternative claim that Caterpillar should be deemed to have admitted it, a defendant is required to be honest in its pleadings. It cannot with impunity deny a fact for lack of knowledge when it obviously has the necessary knowledge or information. David v. Crampton & Knowles Corp., 58 F.R.D. 444, 446 (E.D. Pa. 1973). Although plaintiff asserts that defendant knew at the time it filed its answer whether it manufactured the forklift in question, defendant denies it.[2] Certainly the defendant was only a telephone call from certainty.
 
 
 11
 We find it unnecessary to decide the issue presented solely by the pleadings and the defendant's probable knowledge. Whatever may be the views of this Court on the delay in smoking out the problem and the legal 'niceties' of the answer, the question arises in a fact situation in which the parties and the Court agreed at pretrial that the issue remained for trial. The District Court did not err in proceeding in accord with that agreement.
 
 III.
 
 12
 It is undisputed that Michigan substantive law governs in this diversity case, and that the cause is properly described as a products liability action as defined in Mich. Comp. Laws Sec. 600.2945. The courts of Michigan do not impose absolute liability for defective products on the manufacturers of those products, so a person claiming injury in a products liability action must prove first that the product was defective, second that the defect was causally related to the injuries complained of, and third that the defect is attributable to the manufacturer. Prentis v. Yale Manufacturing Co., 421 Mich. 670, 365 N.W.2d 176 (1984); Piercefield v. Remington Arms Co., Inc., 375 Mich. 85, 133 N.W.2d 129 (1965)
 
 
 13
 To establish that a product is defective, it is not enough to show that the injury would not have occurred had the product been designed differently. Gootee v. Colt Industries, Inc., 712 F.2d 1057, 1064 (6th Cir. 1983) (construing Michigan law). The plaintiff must prove that the defendant was negligent in choosing the particular design. A manufacturer has a duty to design products that are safe for their intended or reasonably foreseeable uses. Coger v. Mackinaw Products Co., 48 Mich. App. 113, 210 N.W.2d 124 (1973). Under Michigan law, even a reasonably foreseeable misuse of the product must be guarded against. Graham v. Ryerson, 96 Mich. App. 480, 491, 292 N.W.2d 704 (1980); Green v. Volkswagen of America, Inc., 485 F.2d 430, 434 (6th Cir. 1973) (construing Michigan law). The jury must determine whether the manufacturer's conduct was reasonable, i.e. whether the risk of harm posed by the chosen design outweighs the utility of that particular design feature. Prentis, 421 Mich. at 688.
 
 
 14
 Mr. Jabbour's claim of defective design rested on his expert's testimony that the accident in which Jabbour was injured was caused by the failure of certain bolts, carriage stop bolts, to perform their intended function of preventing the carriage from raising too far in the forklift's mast. The expert, Neal Hepner, expressed his opinion that the forces exerted on these bolts were too great for the size of the bolt. On the other hand, defendant's expert testified that the bolts perform no stopping function, and that they carry only the weight of the inner rails of the forklift. Clearly, the question whether the design incorporating the carriage stop bolts was defective was one for the jury under Michigan law. See, e.g., Geen, 485 F.2d at 434; Chaney v. Whiting Corp., 100 Mich. App. 108, 298 N.W.2d 681 (1980).
 
 
 15
 The question of causation was similarly disputed in the testimony of the two experts. This, too, is a question of fact for the jury's determination. Gootee, 712 F.2d at 1064; Toth v. Yoder Co., 749 F.2d 1190 (6th Cir. 1984) (citing Comstock v. General Motors Corp., 358 Mich. 163, 99 N.W. 2d 627 (1959)).
 
 
 16
 It was on the third element of the cause of action, that the defect was attributable to the defendant, that the trial court directed a verdict against the plaintiff. The standard urged by the defendant Caterpillar, and apparently accepted by the trial court, required Mr. Jabbour to show that Caterpillar exercised 'undue domination and control' over Towmotor. See Action Plumbing & Heating Co. v. Jared Builders, Inc., 368 Mich. 626, 629, 118 N.W.2d 956 (1962). Action involved a contract action, however, not a products liability case. Products liability law has been described by the Supreme Court of Michigan as a 'fast-developing' area of the law which 'has to shake off various impediments associated with traditional concepts, which, while relevant to other problems, are inappropriate for this new area.' Turner v. Bituminous Casualty Co., 397 Mich. 406, 417, 244 N.W.2d 873 (1976). In Turner, the Court held a purchaser corporation liable for a product defectively designed by its predecessor because of the continuity between the two corporate entities and the 'fairness inherent' in requiring the one who acquires the benefit of a going concern to bear some of its burdens as well. And, in Shirley v. Drackett Products Co., 26 Mich. App. 644, 182 N.W.2d 726 (1970), the court held that a distributor of a defective product would not be insulated from liability where it was so organized as to be no more than 'a mere instrumentality or an agent of another corporation', namely the manufacturer. See also, Bathory v. Procter & Gamble Distributing Co., 306 F.2d 22 (6th Cir. 1962); Swearngin v. Sears Roebuck & Co., 376 F.2d 635 (10th Cir. 1967). Taken together, Turner and Shirley clearly illustrate circumstances under which the separateness of corporate entitites can be disregarded in a products liability case and one held for the acts or omissions of the other because of a continuity between or intermingling of their affairs.
 
 
 17
 An ownership interest is not a necessary prerequisite to a holding that one corporation, which did not in fact manufacture a defective product, can be held liable for the negligence of the corporation which did. Liability of a franchisor for its franchisee is now fairly well-established in the law. In this circuit's Kosters v. Seven-Up Co., 595 F.2d 347 (6th Cir. 1979), this court held that it was for the jury to assess the liability of a franchisor that, through its conduct, induced in the public a belief that it was responsible for and stood behind a product manufactured and distributed by its franchisee. Accord, Kaminsky v. Hertz Corp., 94 Mich. App. 356, 288 N.W.2d 426 (1979). The plaintiff was injured by a bottle that fell from a carton that Seven-Up did not manufacture, supply, or require its franchisee to use. Seven-Up did, however, put the offending carton into the stream of commerce and retain control over the cartons used by its franchis es. Although the Court in Kosters did not address the question that would have been presented had Seven-Up not in fact exercised some control over the allegedly defective carton, id. at 353 n.22, we now address that question because the evidence in the instant case does not reveal that Caterpillar exercised any power to control design or quality control over the particular part claimed to have injured George Jabbour.
 
 
 18
 Michigan courts have indicated a willingness to impose liability on the principal in an apparent agency relationship, and the hallmark of an agency relationship is 'whether the principal maintains a right to control', not whether the principal actually controls the agent's actions. Universal Life Church, Inc. v. Commissioner, 96 Mich. App. 385 (1979). In Johnston v. American Oil Co., 51 Mich. App. 646, 215 N.W.2d 719 (1974), the plaintiff's decedent was killed by an independent service station operator. The trial court granted summary judgment to the oil company that supplied the operator, but the court of appeals reversed, holding that since the station had the outward appearance of one of the company's stations, and sold the supplies and products of the company, and benefited from the company's advertising, a jury question was raised as to the existence of an agency by estoppel. A similar result was reached in Clark v. Texaco, Inc., 55 Mich. App. 100, 222 N.W.2d 52 (1974), but the court also added that a landlord that actively solicits invitees to visit his tenant's premises might be found vicariously liable for injuries caused to those invitees by his tenant.
 
 
 19
 Turning from Michigan for the moment to federal law, the names 'Caterpillar' and 'Cat' and the symbol of a disjointed 'C' are registered trademarks of the Caterpillar Tractor Company that are used freely on products manufactured and marketed by the Towmotor Corporation. The record does not clarify the licensing arrangement between the two corporations that permits this use, if one exists. Even absent such an agreement, however, federal law establishes the relationship that must exist between the owner of a trademark and a user of it:
 
 
 20
 Where a registered mark or mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public.
 
 
 21
 15 U.S.C. Sec. 1055 (1963). Towmotor and Caterpillar must therefore be 'related companies', a term defined as follows:
 
 
 22
 The term 'related companies' means any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used.
 
 
 23
 Id. Sec. 1127 (1982). Under the Lanham Act the owner of a registered trademark risks being held to have abandoned the mark if it permits the use of the mark by an entity that is not a related the exercise of actual control or the appearance of control, induces in the public mind the impression that it is responsible for the nature and quality of the product. In the instant case, a jury could have concluded that Caterpillar controlled or could have controlled the design of the allegedly defective component part, in light of the facts that it:
 
 
 24
 1) is the sole owner of the stock of the actual manufacturer;
 
 
 25
 2) itself operates under a corporate name nationally known as a manufacturer in related product fields;
 
 
 26
 3) owns registered and established trademarks widely-advertised and recognized in the product field;
 
 
 27
 4) permits its subsidiary to use the trademarks on its manufactured products;
 
 
 28
 5) permits the subsidiary to inform the purchasing and using public of the details of the operations and maintenance of the product in pamphlets delivered with the product and designed to accompany it, that bear the trademarks and logo of Caterpillar; and
 
 
 29
 6) gives the impression to a reasonable user or buyer of the product that it is responsible for and stands behind the product.
 
 
 30
 In considering the question, the jury should examine all the circumstances, including any statement on the product identifying the subsidiary as the manufacturer and person responsible. The questions are of control and reasonableness of the appearance of control to an ordinary purchaser or consumer, not the actual exercise of control.
 
 
 31
 The judgment of the District Court is vacated and the case remanded for a new trial.
 
 
 
 *
 The Honorable Timothy S. Hogan, Senior District Judge of the United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 The claimed defect involved in this case is in the 'mast' part of the lift
 
 
 [2]
 The issue arose in this case prior to the amendment of Federal Rule of Civil Procedure 11 requiring 'reasonable inquiry' by counsel before pleading