The DETROIT LIONS, INC., a corporation and BILLY SIMS, Plaintiffs,

v.

Jerry A. ARGOVITZ, Individually and as President of the Houston Gamblers, Inc., a corporation, et al., Defendants.

Civ. A. No. 83CV5649DT.

United States District Court,
E.D. Michigan, S.D.

Feb. 10, 1984.

Michael Lewiston, Bodman, Longley & Dahling, Detroit, Mich., for the Detroit Lions.

Elbert Hatchett, Pontiac, Mich., for Billy Sims.

Stephen Susman, Houston, Tex., for defendants.

## MEMORANDUM OPINION

DeMASCIO, District Judge.

The plot for this Saturday afternoon serial began when Billy Sims, having signed a contract with the Houston Gamblers on July 1, 1983, signed a second contract with the Detroit Lions on December 16, 1983. On December 18, 1983, the Detroit Lions, Inc. (Lions) and Billy R. Sims filed a complaint in the Oakland County Circuit Court seeking a judicial determination that the July 1, 1983, contract between Sims and the Houston Gamblers, Inc. (Gamblers) is invalid because the defendant Jerry Argovitz (Argovitz) breached his fiduciary duty when negotiating the Gamblers' contract and because the contract was otherwise tainted by fraud and misrepresentation. Defendants promptly removed the action to

this court based on our diversity of citizenship jurisdiction.[*]

For the reasons that follow, we have concluded that Argovitz's breach of his fiduciary duty during negotiations for the Gamblers' contract was so pronounced, so egregious, that to deny recision would be unconscionable.

Sometime in February or March 1983, Argovitz told Sims that he had applied for a Houston franchise in the newly formed United States Football League (USFL). In May 1983, Sims attended a press conference in Houston at which Argovitz announced that his application for a franchise had been approved. The evidence persuades us that Sims did not know the extent of Argovitz's interest in the Gamblers. He did not know the amount of Argovitz's original investment, or that Argovitz was obligated for 29 percent of a $1.5 million letter of credit, or that Argovitz was the president of the Gamblers' Corporation at an annual salary of $275,000 and 5 percent the yearly cash flow. The defendants could not justifiably expect Sims to comprehend the ramifications of Argovitz's interest in the Gamblers or the manner in which that interest would create an untenable conflict of interest; a conflict that would inevitably breach Argovitz's fiduciary duty to Sims. Argovitz knew, or should have known, that he could not act as Sims' agent under any circumstances when dealing with the Gamblers. Even the USFL Constitution itself prohibits a holder of any interest in a member club from acting "as the contracting agent or representative for any player."

Pending the approval of his application for a USFL franchise in Houston, Argovitz continued his negotiations with the Lions on behalf of Sims. On April 5, 1983, Argovitz offered Sims' services to the Lions for $6 million over a four-year period. The offer included a demand for a $1 million interest-free loan to be repaid over 10 years, and for skill and injury guarantees for three years. The Lions quickly responded with a counter offer on April 7, 1983, in the face amount of $1.5 million over a five-year period with additional incentives not relevant here. The negotiating process was working. The Lions were trying to determine what Argovitz really believed the market value for Sims really was. On May 3, 1983, with his Gamblers franchise assured, Argovitz significantly reduced his offer to the Lions. He now offered Sims to the Lions for $3 million over a four-year period, one-half of the amount of his April 5, 1983, offer. Argovitz's May 3rd offer included a demand for $50,000 to permit Sims to purchase an annuity. Argovitz also dropped his previous demand for skill guarantees. The May 10, 1983 offer submitted by the Lions brought the parties much closer.

On May 30, 1983, Argovitz asked for $3.5 million over a five-year period. This offer included an interest-free loan and injury protection insurance but made no demand for skill guarantees. The May 30 offer now requested $400,000 to allow Sims to purchase an annuity. On June 1, 1983, Argovitz and the Lions were only $500,000 apart. We find that the negotiations between the Lions and Argovitz were progressing normally, not laterally as Argovitz represented to Sims. The Lions were not "dragging their feet." Throughout the entire month of June 1983, Mr. Frederick Nash, the Lions' skilled negotiator and a fastidious lawyer, was involved in investigating the possibility of providing an attractive annuity for Sims and at the same time doing his best to avoid the granting of either skill or injury guarantees. The evidence establishes that on June 22, 1983, the Lions and Argovitz were very close to reaching an agreement on the value of Sims' services.

---

[*] The Lions and Sims filed separate amended complaints on December 30, 1983, and January 9, 1984, respectively. By that time Sims had obtained his own counsel and was vigorously prosecuting his separate action. The parties and the Court agreed to bifurcate the trial. Our reasons for not permitting the Lions to proceed on its complaint are contained in a separate order, filed January 26, 1984.

Apparently, in the midst of his negotiations with the Lions and with his Gamblers franchise in hand, Argovitz decided that he would seek an offer from the Gamblers. Mr. Bernard Lerner, one of Argovitz's partners in the Gamblers agreed to negotiate a contract with Sims. Since Lerner admitted that he had no knowledge whatsoever about football, we must infer that Argovitz at the very least told Lerner the amount of money required to sign Sims and further pressed upon Lerner the Gamblers' absolute need to obtain Sims' services. In the Gamblers' organization, only Argovitz knew the value of Sims' services and how critical it was for the Gamblers to obtain Sims. In Argovitz's words, Sims would make the Gamblers' franchise.

On June 29, 1983, at Lerner's behest, Sims and his wife went to Houston to negotiate with a team that was partially owned by his own agent. When Sims arrived in Houston, he believed that the Lions organization was not negotiating in good faith; that it was not really interested in his services. His ego was bruised and his emotional outlook toward the Lions was visible to Burrough and Argovitz. Clearly, virtually all the information that Sims had up to that date came from Argovitz. Sims and the Gamblers did not discuss a future contract on the night of June 29th. The negotiations began on the morning of June 30, 1983, and ended that afternoon. At the morning meeting, Lerner offered Sims a $3.5 million five-year contract, which included three years of skill and injury guarantees. The offer included a $500,000 loan at an interest rate of 1 percent over prime. It was from this loan that Argovitz planned to receive the $100,000 balance of his fee for acting as an agent in negotiating a contract with his own team. Burrough testified that Sims would have accepted that offer on the spot because he was finally receiving the guarantee that he had been requesting from the Lions, guarantees that Argovitz dropped without too much quarrel. Argovitz and Burrough took Sims and his wife into another room to discuss the offer. Argovitz did tell Sims that he thought the Lions would match the Gam-

blers financial package and asked Sims whether he (Argovitz) should telephone the Lions. But, it is clear from the evidence that neither Sims nor Burrough believed that the Lions would match the offer. We find that Sims told Argovitz not to call the Lions for purely emotional reasons. As we have noted, Sims believed that the Lions' organization was not that interested in him and his pride was wounded. Burrough clearly admitted that he was aware of the emotional basis for Sims' decision not to have Argovitz phone the Lions, and we must conclude from the extremely close relationship between Argovitz and Sims that Argovitz knew it as well. When Sims went back to Lerner's office, he agreed to become a Gambler on the terms offered. At that moment, Argovitz irreparably breached his fiduciary duty. As agent for Sims he had the duty to telephone the Lions, receive its final offer, and present the terms of both offers to Sims. Then and only then could it be said that Sims made an intelligent and knowing decision to accept the Gamblers' offer.

■ During these negotiations at the Gamblers' office, Mr. Nash of the Lions telephoned Argovitz, but even though Argovitz was at his office, he declined to accept the telephone call. Argovitz tried to return Nash's call after Sims had accepted the Gamblers' offer, but it was after 5 p.m. and Nash had left for the July 4th weekend. When he declined to accept Mr. Nash's call, Argovitz's breach of his fiduciary duty became even more pronounced. Following Nash's example, Argovitz left for his weekend trip, leaving his principal to sign the contracts with the Gamblers the next day, July 1, 1983. The defendants, in their supplemental trial brief, assert that neither Argovitz nor Burrough can be held responsible for following Sims' instruction not to contact the Lions on June 30, 1983. Although it is generally true that an agent is not liable for losses occurring as a result of following his principal's instructions, the rule of law is not applicable when the agent has placed himself in a position adverse to that of his principal.

During the evening of June 30, 1983, Burrough struggled with the fact that they had not presented the Gamblers' offer to the Lions. He knew, as does the court, that Argovitz now had the wedge that he needed to bring finality to the Lions' negotiations. Burrough was acutely aware of the fact that Sims' actions were emotionally motivated and realized that the responsibility for Sims' future rested with him. We view with some disdain the fact that Argovitz had, in effect, delegated his entire fiduciary responsibility on the eve of his principal's most important career decision. On July 1, 1983, it was Lerner who gave lip service to Argovitz's conspicuous conflict of interest. It was Lerner, not Argovitz, who advised Sims that Argovitz's position with the Gamblers presented a conflict of interest and that Sims could, if he wished, obtain an attorney or another agent. Argovitz, upon whom Sims had relied for the past four years, was not even there. Burrough, conscious of Sims' emotional responses, never advised Sims to wait until he had talked with the Lions before making a final decision. Argovitz's conflict of interest and self dealing put him in the position where he would not even use the wedge he now had to negotiate with the Lions, a wedge that is the dream of every agent. Two expert witnesses testified that an agent should telephone a team that he has been negotiating with once he has an offer in hand. Mr. Woolf, plaintiff's expert, testified that an offer from another team is probably the most important factor in negotiations. Mr. Lustig, defendant's expert, believed that it was prudent for him to telephone the Buffalo Bills and inform that organization of the Gamblers' offer to Jim Kelly, despite the fact that he believed the Bills had already made its best offer to his principal. The evidence here convinces us that Argovitz's negotiations with the Lions were ongoing and it had not made its final offer. Argovitz did not follow the common practice described by both expert witnesses. He did not do this because he knew that the Lions would not leave Sims without a contract and he further knew that if he made that type of call Sims would be lost to the Gamblers, a team he owned.

On November 12, 1983, when Sims was in Houston for the Lions game with the Houston Oilers, Argovitz asked Sims to come to his home and sign certain papers. He represented to Sims that certain papers of his contract had been mistakenly overlooked and now needed to be signed. Included among those papers he asked Sims to sign was a waiver of any claim that Sims might have against Argovitz for his blatant breach of his fiduciary duty brought on by his glaring conflict of interest. Sims did not receive independent advice with regard to the wisdom of signing such a waiver. Despite having sold his agency business in September, Argovitz did not even tell Sims' new agent of his intention to have Sims sign a waiver. Nevertheless, Sims, an unsophisticated young man, signed the waiver. This is another example of the questionable conduct on the part of Argovitz who still had business management obligations to Sims. In spite of his fiduciary relationship he had Sims sign a waiver without advising him to obtain independent counseling.

Argovitz's negotiations with Lustig, Jim Kelly's agent, illustrates the difficulties that develop when an agent negotiates a contract where his personal interests conflict with those of his principal. Lustig, an independent agent, ignored Argovitz's admonishment not to "shop" the Gamblers' offer to Kelly. Lustig called the NFL team that he had been negotiating with because it was the "prudent" thing to do. The Gamblers agreed to pay Kelly, an untested rookie quarterback $3.2 million for five years. His compensation was $60,000 less than Sims', a former Heisman Trophy winner and a proven star in the NFL. Lustig also obtained a number of favorable clauses from Argovitz; the most impressive one being that Kelly was assured of being one of the three top paid quarterbacks in the USFL if he performed as well as expected. If Argovitz had been free from conflicting interests he would have demanded similar benefits for Sims. Argo-

vitz claimed that the nondisclosure clause in Kelly's contract prevented him from mentioning the Kelly contract to Sims. We view this contention as frivolous. Requesting these benefits for Sims did not require disclosure of Kelly's contract. Moreover, Argovitz's failure to obtain personal guarantees for Sims without adequately warning Sims about the risks and uncertainties of a new league constituted a clear breach of his fiduciary duty.

The parties submitted a great deal of evidence and argued a number of peripheral issues. Although most of the issues were not determinative factors in our decision, they do demonstrate that Argovitz had a history of fulfilling his fiduciary duties in an irresponsible manner. One cannot help but wonder whether Argovitz took his fiduciary duty seriously. For example, after investing approximately $76,-000 of Sims' money, Argovitz, with or without the prior knowledge of his principal, received a finder's fee. Despite the fact that Sims paid Argovitz a 2 percent fee, Argovitz accepted $3800 from a person with whom he invested Sims' money. In March 1983, Argovitz had all of his veteran players, including Sims, sign a new agency contract with less favorable payment terms for the players even though they already had an ongoing agency agreement with him. He did this after he sold his entire agency business to Career Sports. Finally, Argovitz was prepared to take the remainder of his 5 percent agency fee for negotiating Sims' contract with the Gamblers from monies the Gamblers loaned to Sims at an interest rate of 1 percent over prime. It mattered little to Argovitz that Sims would have to pay interest on the $100,000 that Argovitz was ready to accept. While these practices by Argovitz are troublesome, we do not find them decisive in examining Argovitz's conduct while negotiating the Gamblers' contract on June 30 and July 1, 1983. We find this circumstantial evidence useful only insofar as it has aided the court in understanding the manner in which these parties conducted business.

We are mindful that Sims was less than forthright when testifying before the court. However, we agree with plaintiff's counsel that the facts as presented through the testimony of other witnesses are so unappealing that we can disregard Sims' testimony entirely. We remain persuaded that on balance, Argovitz's breach of his fiduciary duty was so egregious that a court of equity cannot permit him to benefit by his own wrongful breach. We conclude that Argovitz's conduct in negotiating Sims' contract with the Gamblers rendered it invalid.

## CONCLUSIONS OF LAW

1. This court's jurisdiction is based on diversity of citizenship and, therefore, Michigan's conflict of laws rules apply. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

2. The Michigan courts would apply the law of Texas because all of the contracts giving rise to a claim of fraud or breach of fiduciary duty occurred in Texas. *Rubin v. Gallagher,* 294 Mich. 124, 292 N.W. 584 (1940); *Hardy v. Monsanto Enviro-Chem Systems, Inc.,* 414 Mich. 29, 84–85, 323 N.W.2d 270 (1982) (Moody, Jr., J., dissenting in part); *Wells v. 10–X Manufacturing Co.,* 609 F.2d 248, 253 (6th Cir.1979). Moreover the parties have stipulated to the application of Texas law.

3. The relationship between a principal and agent is fiduciary in nature, and as such imposes a duty of loyalty, good faith, and fair and honest dealing on the agent. *Anderson v. Griffith,* 501 S.W.2d 695, 700 (Tex.Civ.App.1973).

4. A fiduciary relationship arises not only from a formal principal-agent relationship, but also from informal relationships of trust and confidence. *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962); *Adickes v. Andreoli,* 600 S.W.2d 939, 945–46 (Tex.Civ.App.1980).

5. In light of the express agency agreement, and the relationship between Sims and Argovitz, Argovitz clearly owed Sims

the fiduciary duties of an agent at all times relevant to this lawsuit.

■ 6. An agent's duty of loyalty requires that he not have a personal stake that conflicts with the principal's interest in a transaction in which he represents his principal. As stated in *Burleson v. Earnest*, 153 S.W.2d 869 (Tex.Civ.App.1941):

> (T)he principal is entitled to the best efforts and unbiased judgment of his agent.... (T)he law denies the right of an agent to assume any relationship that is antagonistic to his duty to his principal, and it has many times been held that the agent cannot be both buyer and seller at the same time nor connect his own interests with property involved in his dealings as an agent for another.

*Id.* at 874.

■ 7. A fiduciary violates the prohibition against self-dealing not only by dealing with himself on his principal's behalf, but also by dealing on his principal's behalf with a third party in which he has an interest, such as a partnership in which he is a member. In *Daniel v. Henderson*, 183 S.W.2d 242 (Tex.Civ.App.1944), *aff'd sub nom., Southern Trust & Mortgage Co. v. Daniel*, 143 Tex. 321, 184 S.W.2d 465 (1944), the court held:

> The trustee violates his duty to the beneficiary not only where he purchases the trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale. Thus, a trustee violates his duty if he sells trust property to a firm of which he is a member or to a corporation in which he has a controlling or substantial interest.

183 S.W.2d at 245 (quoting Restatement of Trusts Section 170(c) (1935)).

■ 8. Where an agent has an interest adverse to that of his principal in a transaction in which he purports to act on behalf of his principal, the transaction is voidable by the principal unless the agent disclosed all material facts within the agent's knowledge that might affect the principal's judg-

ment. *Burleson v. Earnest*, 153 S.W.2d at 874–75.

■ 9. The mere fact that the contract is fair to the principal does not deny the principal the right to rescind the contract when it was negotiated by an agent in violation of the prohibition against self-dealing. As stated in *Burleson:*

> The question, therefore, does not relate to the *mala fides* of the agent nor to whether or not a greater sum might have been procured for the property, nor even to whether or not the vendor received full value therefor. The self-interest of the agent is considered a vice which renders the transaction voidable at the election of the principal without looking into the matter further than to ascertain that the interest of the agent exists.

■ 10. Once it has been shown that an agent had an interest in a transaction involving his principal antagonistic to the principal's interest, fraud on the part of the agent is presumed. The burden of proof then rests upon the agent to show that his principal had full knowledge, not only of the fact that the agent was interested, but also of every material fact known to the agent which might affect the principal and that having such knowledge, the principal freely consented to the transaction.

■ 11. It is not sufficient for the agent merely to inform the principal that he has an interest that conflicts with the principal's interest. Rather, he must inform the principal "of all facts that come to his knowledge that are or may be material or which might affect his principal's rights or interests or influence the action he takes." *Anderson v. Griffith*, 501 S.W.2d 695, 700 (Tex.Civ.App.1973).

■ 12. Argovitz clearly had a personal interest in signing Sims with the Gamblers that was adverse to Sims' interest—he had an ownership interest in the Gamblers and thus would profit if the Gamblers were profitable, and would incur substantial personal liabilities should the Gamblers not be financially successful. Since this showing has been made, fraud on Argo-

vitz's part is presumed, and the Gamblers' contract must be rescinded unless Argovitz has shown by a preponderance of the evidence that he informed Sims of every material fact that might have influenced Sims' decision whether or not to sign the Gamblers' contract.

 13. We conclude that Argovitz has failed to show by a preponderance of the evidence either: 1) that he informed Sims of the following facts, or 2) that these facts would not have influenced Sims' decision whether to sign the Gamblers' contract:

a. The relative values of the Gamblers' contract and the Lions' offer that Argovitz knew could be obtained.

b. That there was significant financial differences between the USFL and the NFL not only in terms of the relative financial stability of the Leagues, but also in terms of the fringe benefits available to Sims.

c. Argovitz's 29 percent ownership in the Gamblers; Argovitz's $275,000 annual salary with the Gamblers; Argovitz's five percent interest in the cash flow of the Gamblers.

d. That both Argovitz and Burrough failed to even attempt to obtain for Sims valuable contract clauses which they had given to Kelly on behalf of the Gamblers.

e. That Sims had great leverage, and Argovitz was not encouraging a bidding war that could have advantageous results for Sims.

 14. Under Texas law, a nonbinding prior act cannot be ratified, and the right to seek recision cannot be waived, unless the party against whom these defenses are asserted had full knowledge of all material facts at the time the acts of ratification or waiver are alleged to have occurred.

 15. At no time prior to December 1, 1983, was Sims aware of the material nondisclosures outlined above; accordingly, the defenses of ratification and waiver must be rejected.

16. Defendants asserted defenses of estoppel and latches are also without merit.

 17. As a court sitting in equity, we conclude that recision is the appropriate remedy. We are dismayed by Argovitz's egregious conduct. The careless fashion in which Argovitz went about ascertaining the highest price for Sims' service convinces us of the wisdom of the maxim: no man can faithfully serve two masters whose interests are in conflict.

Judgment will be entered for the plaintiffs rescinding the Gamblers' contract with Sims.

IT IS SO ORDERED.