William C. O'DONNELL,
Plaintiff-Appellant,

v.

CBS, INC., a foreign corporation,
Defendant-Appellee.

No. 85–1489.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1985.

Decided Feb. 4, 1986.

Leonard M. Ring, Leonard M. Ring & Assoc., Chicago, Ill., for plaintiff-appellant.

A. Daniel Feldman, Isham, Lincoln & Beale, Chicago, Ill., for defendant-appellee.

Before BAUER and COFFEY, Circuit Judges, and GORDON, Senior District Judge.[*]

BAUER, Circuit Judge.

Plaintiff appeals the district court's grant of summary judgment in favor of defendant as to several counts in plaintiff's complaint alleging libel and violation of plaintiff's right to privacy. We affirm the judgment of the district court.

## I.

We construe the facts in this case in the light most favorable to plaintiff because he was the party opposing the motion for summary judgment. *See Janowiak v. Corporate City of South Bend*, 750 F.2d 557, 559 (7th Cir.1984). Plaintiff William C. O'Donnell had been employed by defendant CBS, Inc. (CBS) since 1962 and had held the position of Vice-President and General Manager of radio station WBBM–AM in Chicago since 1974. In this position O'Donnell headed the station's editorial board and made all final decisions regarding editorials, including approval of the final text.

In January 1980, Eugene Murphy, a friend and neighbor of O'Donnell, wrote twice to O'Donnell in an attempt to interest O'Donnell in investing in Alburn, Inc. (Alburn), a company which Murphy had helped establish. Alburn was in the business of incinerating toxic wastes and at that time Murphy anticipated an increase in business because EPA regulations were scheduled to go into effect which would have prohibited the burial of certain flammable liquid wastes in landfills. Murphy was therefore seeking capital to expand Alburn's operations. O'Donnell did not invest in Alburn at that time, but continued to receive information about Alburn and the EPA regulations from Murphy.

In May or June 1980, O'Donnell assigned two WBBM–AM reporters to do a story on the dangers of burying liquid toxic wastes and recommended Murphy as a source for the story. On November 25, 1980, O'Donnell broadcast an editorial on WBBM–AM which he personally read, praising the EPA's toxic waste regulations but criticizing the exclusion of "thousands of chemicals" from the regulations. This editorial, like all others, was discussed at a meeting of the editorial board which was chaired by O'Donnell, and O'Donnell approved of its content and final text.

The EPA regulations concerning toxic waste burial became effective on November 19, 1980, but the EPA failed to strictly enforce them. Executives at Alburn, including Murphy, began writing to the EPA complaining that the law enforcement was crippling its business. Copies of this correspondence were sent to O'Donnell.

In January 1981, O'Donnell acquired a five percent interest in Alburn, for which he paid $30,000. Some five months later O'Donnell became a member of Alburn's board of directors. Also in January or in early February 1981, O'Donnell brought the problem of the EPA's failure to enforce its own regulations to the attention of Susan Nixon, WBBM–AM's Editorial Director, and suggested that she do an editorial concerning the subject. O'Donnell recommended Alburn as a source of information.

The editorial aired on February 9, 1981, and, at O'Donnell's request, was read by Nixon. O'Donnell had told Nixon of his interest in Alburn and explained that it would be more appropriate if she read the station's environmental editorials. O'Donnell also informed John Hultman, News Director of WBBM–AM, of his interest in

---

[*] The Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

Alburn. The editorial board agreed that the editorials were in the public interest, and CBS does not dispute this fact. Although O'Donnell subsequently filed conflict of interest statements with CBS officials in New York, he did not report his interest in Alburn in these statements, as required by CBS policy.

WBBM–AM broadcast five additional editorials on the disposal of toxic wastes and the EPA's failure to enforce its regulations between March 1981 and February 1982. As in the case of the February 9th editorial, O'Donnell chaired the meetings and approved the final text of all these editorials and they were read on the air by Nixon. During this period of time, Alburn was also attempting to persuade the EPA to enforce its regulations. As a member of Alburn's board of directors, O'Donnell attended directors' meetings discussing the problem and participated in Alburn's attempt to persuade the EPA to enforce the regulations.

On February 24, 1982, O'Donnell's secretary, Sarah Oliver, telephoned Eugene Lothery, Vice-President of CBS in charge of AM radio stations, in New York. Oliver told Lothery that she believed O'Donnell had a conflict of interest, and later explained that O'Donnell was a part owner of a toxic waste disposal company and that WBBM–AM had espoused a position favorable to the company in its editorials. Oliver told Lothery that she had copies of the editorials and correspondence between O'Donnell and the company because she had access to O'Donnell's files and had typed his correspondence. Lothery directed Oliver to send him these copies.

Lothery received these materials and reviewed them with other officers of CBS in New York. They decided that if O'Donnell did have an interest in Alburn and the correspondence was indeed his own, and if he had participated in the editorials concerning toxic waste disposal, his employment would be terminated. O'Donnell was then summoned to New York to meet with the CBS officials on March 2, 1982.

At the meeting O'Donnell admitted his interest in Alburn. He stated that he had

never concealed his interest and that it was well known at WBBM–AM. Robert Hosking, President of CBS radio, told O'Donnell that this made no difference. Hosking later stated that O'Donnell could have properly broadcast the editorials if he had absented himself totally from the editorial process and had asked Lothery or Lothery's supervisor to approve them. Hosking then told O'Donnell that he was dismissed, effective immediately.

Upon O'Donnell's firing, Hosking telephoned Lothery, who was in Chicago to arrange for O'Donnell's replacement. When informed that O'Donnell had been fired, Lothery offered O'Donnell's position to Greg Peterson, who accepted the offer. Lothery and Peterson then went to the radio station to introduce Peterson as the new general manager, and Lothery read the following statement to the twenty to thirty employees who had assembled:

> William C. O'Donnell has been dismissed as Vice President, CBS Radio Division and General Manager, WBBM–AM/Chicago, effective immediately.
>
> As General Manager of WBBM–AM, Mr. O'Donnell was responsible for all broadcast material aired on the station. CBS has learned that Mr. O'Donnell owns an approximately 5% financial interest in a Chicago company, Alburn, Inc., an incineration and chemical waste treatment company. During the period of time in which Mr. O'Donnell has owned this interest, he was involved with and authorized the broadcast of a number of editorials which urge governmental action on EPA issues, from which Alburn, Inc. stood to benefit. In addition, the station aired news and public affairs broadcasts on these issues.
>
> CBS considers this to have been a conflict of interest which violated CBS policy. CBS is continuing to investigate this matter.

That evening, WBBM–AM broadcast this statement five times and WBBM–TV broadcast the statement twice. The statement was also broadcast five times on WBBM–AM the following morning.

On March 30, 1982, O'Donnell filed suit against CBS in the Circuit Court of Cook County, Illinois. CBS removed the action to the United States District Court for the Northern District of Illinois, Eastern Division. Counts I and II of the complaint alleged that CBS libeled O'Donnell by broadcasting the statement of his dismissal. Count III alleged a violation of the FCC's "personal attack rule." Count IV alleged retaliatory discharge. Counts V and VII alleged that CBS intentionally interfered with O'Donnell's prospective economic advantage by broadcasting the report of his dismissal. Count VI alleged that CBS intruded upon O'Donnell's right to privacy by ordering his secretary to search his private files and extract papers from them. Count VIII alleged that the report of O'Donnell's dismissal broadcast by CBS invaded O'Donnell's privacy by placing him in a false light.

CBS moved for dismissal on Counts III and IV and for summary judgment on the remaining counts. The District Court, in a Memorandum Opinion dated September 13, 1983, dismissed Counts III and IV but left standing the other counts. At the close of discovery, on October 19, 1984, CBS renewed its motion for summary judgment on the remaining counts. In a Memorandum Opinion dated February 25, 1985, the District Court granted the motion. O'Donnell now appeals the grant of summary judgment.

## II.

O'Donnell initially argues that the trial court incorrectly ruled that he was a limited purpose public figure in regard to the announcement of his firing, and that therefore the New York Times actual malice standard should not apply to the announcement. Both parties agree that application of the three-part test for determining limited purpose public figures enunciated in Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287 (D.C.Cir.) cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980), is proper. O'Donnell concedes that the EPA controversy was a

public controversy and that he thrust himself to the forefront of the controversy in an effort to influence its outcome, the first two parts of the test. 627 F.2d at 1296–97. O'Donnell contends, however, that the announcement of his firing was not germane to his participation in the controversy concerning the EPA's failure to enforce its toxic waste regulations, thereby failing to meet the third part of the Waldbaum test. 627 F.2d at 1298. O'Donnell argues that his firing concerned only an alleged violation of CBS's conflict of interests policy and had nothing to do with the EPA controversy.

We disagree. O'Donnell acted as an advocate of a particular point of view in the EPA controversy, and his removal from a media position through which he sought to influence the controversy is necessarily germane to his participation in the controversy. O'Donnell's argument incorrectly focuses on the substantive issues of the EPA controversy; we are concerned only with O'Donnell's participation in the controversy. See Waldbaum, 627 F.2d at 1298. We find that his removal as head of WBBM–AM's editorial board clearly affected his status as an advocate of the position he espoused and the manner in which he was able to further participate in the controversy. We therefore agree with the trial court that O'Donnell was a limited purpose public figure in regard to the announcement of his firing.

## III.

O'Donnell contends that even if he was properly required to show actual malice, the trial court nevertheless applied the wrong standard in ruling on CBS's motion for summary judgment. O'Donnell asserts that the trial court incorrectly required him to present "clear and convincing" proof of the elements of his case in response to the motion and instead should have applied the less stringent requirement that he present "some evidence" of these elements. This contention misstates the trial court's ruling; the trial judge stated that "under either standard, O'Donnell has failed to pro-

duce evidence sufficient to defeat a summary judgment motion." Mem. Op. of February 25, 1985 at 5. The propriety of the "clear and convincing" standard, a matter which is presently before the Supreme Court in *Anderson v. Liberty Lobby, Inc.,* 746 F.2d 1563 (D.C.Cir.1984), *cert. granted,* —— U.S. ——, 105 S.Ct. 2672, 86 L.Ed.2d 691 (1985), is therefore irrelevant to our review of this case. As the trial judge noted in his opinion, his discussion of the "clear and convincing" standard was "academic rather than dispositive." Mem. Op. of Feb. 25, 1985 at 5.

## IV.

■ O'Donnell contends that even under a "clear and convincing" standard he presented sufficient evidence to withstand CBS's motion for summary judgment. We have examined the record[1] and determine that O'Donnell did not present even "some evidence" that the announcement was in any way false. We will now discuss O'Donnell's several arguments to the contrary.

O'Donnell contends that the district court erred in finding that the announcement of his firing was not false because the court limited its inquiry to whether O'Donnell owned an interest in Alburn when he participated in the editorials on the EPA controversy and whether this violated CBS's conflict of interest policy. O'Donnell asserts that this inquiry was unduly limited because he never disputed that he owned an interest in Alburn and he admits that he "technically" violated CBS policy. O'Donnell also does not contest that a CBS employee could be fired for this violation. We initially note that these admissions comprise nearly the entire statement of facts contained in the announcement of O'Donnell's firing. O'Donnell argues, however, that the announcement was false because it inferred that O'Donnell concealed his interest in Alburn and that he was fired when CBS first learned of that interest.

Under Illinois' innocent construction rule, a statement's "words and the implications therefrom [are to be] given their natural and obvious meaning." *Chapski v. The Copley Press,* 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195, 199 (Ill.1982). Any doubts are to be resolved in favor of the plaintiff. *Id.* O'Donnell argues that the language in the announcement that "CBS has learned [of O'Donnell's interest in Alburn]" implies that O'Donnell concealed that interest from CBS when the evidence showed that several employees at WBBM–AM knew about it. The "natural and obvious" meaning of this language, however, and of the announcement as a whole, is not that no one at WBBM–AM knew of O'Donnell's interest in Alburn; its more natural import is that the CBS officials responsible for enforcing the conflict of interests policy which O'Donnell had violated had just learned of his interest in Alburn. These officials were in New York, not at WBBM–AM in Chicago where the employees who knew of O'Donnell's interest in Alburn were not his superiors and were not empowered to fire him.

Moreover, the evidence showed that O'Donnell failed to disclose his interest in Alburn to his superiors in New York even though he was required to do so by CBS's written policy and news standards. The evidence also indicates that he knew his interest in Alburn presented a conflict in that he requested the station's editorial director to read the editorials concerning the EPA controversy in his stead because of that interest. Therefore, even if the announcement of his firing did imply that he concealed his interest from CBS, as O'Donnell asserts, he failed to present any evidence that this implication is false as to the proper CBS officials in New York.

O'Donnell argues that the CBS officials in New York had imputed knowledge of his interest in Alburn because it was known to several employees at WBBM–AM, and

---

**1.** *See New York Times v. Sullivan,* 376 U.S. 254, 284–85, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964) (appellate review of sufficiency of evidence proper where defamation implicates first amendment); *Carson v. Allied News Co.,* 529 F.2d 206, 210 (7th Cir.1976) (same; reversing grant of summary judgment in favor of defendant).

therefore the statement that CBS "ha[d] learned" of this interest was false because it implied that CBS had just learned of his interest in Alburn. In support of this argument, O'Donnell cites *United Disposal Co. v. Industrial Comm'n*, 291 Ill. 480, 126 N.E. 183 (1920), which held that

> [n]otice to or knowledge of an agent while acting within the scope of his authority and in reference to a matter over which his authority extends is notice to or knowledge of the principal, but in order to be binding upon the principal the knowledge must be acquired while the agent is acting within the scope of his authority and in reference to a matter over which his authority extends.

126 N.E. at 185. The evidence presented, however, showed that the employees whom O'Donnell told of his interest in Alburn were not in a position to enforce CBS's conflict of interests policy. Thus, any statements of his ownership interest in Alburn did not refer to a matter over which their authority extended, and therefore cannot be imputed to the responsible CBS officials in New York according to O'Donnell's authority. We therefore reject O'Donnell's argument that CBS had imputed knowledge of his interest in Alburn.

O'Donnell further contends that the announcement of his firing falsely implied that the editorials on the EPA controversy were broadcast "solely to line O'Donnell's pockets" and were contrary to the views of CBS. Again, we do not believe that this interpretation comports with the "natural and obvious" meaning of the announcement. The announcement stated that O'Donnell participated in editorials "which urged governmental action on EPA issues from which Alburn, Inc. stood to benefit." This statement is undeniably true and is greatly dissimilar from O'Donnell's interpretation in both its meaning and tenor. We refuse to contort either to suit O'Donnell's purposes. Moreover, it is nonsensical to assert any implication existed concerning "the views of CBS." Each CBS radio station independently formulates its own editorial policy so that there is no overall "CBS view." Further, there was no policy

at WBBM–AM that was separate and apart from that which O'Donnell helped formulate and over which he had final approval; this, as the announcement of his firing states, is precisely the reason O'Donnell's interest in Alburn was a conflict of interest.

Finally, O'Donnell claims that the announcement of his firing was false because he presented evidence that he was fired for reasons other than the reason stated. This evidence consisted of reports indicating the station's declining popularity and an alleged statement by Lothery at a WBBM–AM staff luncheon held after O'Donnell's firing to the effect that O'Donnell would have been fired in any event due to the radio station's falling ratings. The district court referred to Lothery's alleged statement as "one speculative prediction allegedly made in passing by Lothery six months after O'Donnell's dismissal." Mem. Op. of Feb. 25, 1985 at 10. O'Donnell argues, however, that Lothery's remark was important "because a jury could properly consider it in deciding whether CBS merely seized on the alleged conflict of interest as a means to accomplish what it had previously decided [:] to fire O'Donnell." Br. at 32. This argument fails because O'Donnell incorrectly asserts that there was only an "alleged" conflict of interest. In fact, a real conflict of interest in violation of CBS policy existed, as O'Donnell now admits. O'Donnell does not argue that he could not have been justifiably fired for this conflict. Further, Lothery's alleged statement fails as evidence of a pretext because it does not imply that he was not fired for the conflict, but merely asserts that CBS may have had an additional legitimate reason for wanting him fired. Therefore, even if O'Donnell did present evidence that CBS wanted him fired for other reasons, his claim fails because he presented no evidence that he was not in truth fired for his conflict of interest.

O'Donnell makes several arguments concerning actual malice, but we need not discuss them because they necessarily fail by reason of our ruling that O'Donnell failed

to present any evidence of false statements in the announcement of his firing.

## V.

O'Donnell also argues that the district court erred in granting summary judgment in favor of CBS as to his claim of intrusion upon seclusion. This claim is based on the New York CBS officials' receipt of copies of certain papers indicating O'Donnell's conflict of interest from O'Donnell's secretary, Sarah Oliver, who had removed the papers from O'Donnell's locked credenza and copied them. O'Donnell's argument in support of this claim has evolved into an exercise in legal gymnastics, but his juristic gyrations do not persuade us to alter the district court's ruling.

At first, O'Donnell alleged that CBS intruded upon his seclusion by ordering Oliver to open O'Donnell's locked credenza and remove the relevant papers for copying. The trial judge ruled, however, that

> O'Donnell has adduced no evidence in the record that CBS in any way "induced" the alleged intrusion into his credenza. Instead, the evidence is uncontroverted that O'Donnell's secretary acted entirely on her own, without the knowledge of, and without instructions from, CBS.

Mem.Op. of Feb. 25, 1985 at 11. O'Donnell then argued that even if Oliver acted entirely on her own, CBS was vicariously liable for her intrusion because she was an agent of CBS acting within the scope of her employment. The trial judge disagreed, noting that

> [a]s CBS points out, and O'Donnell does not dispute, O'Donnell had given his secretary the key to his credenza and allowed her completely free access to it and to the files which it held. O'Donnell concedes he had consented to his secretary's access to his credenza, but argues that the fact that one person has access of certain files does not remove the expectation of privacy as to everyone else.

However, if O'Donnell's secretary was, as O'Donnell urges, CBS's agent, the consent given to her in that capacity would flow to her principal, CBS. Moreover, O'Donnell's argument that any consent he gave to his secretary was exceeded by passing information to a third party is inapposite since, in accordance with O'Donnell's agency theory, CBS, through its agent, had been given consent to enter the credenza.

*Id.* at 11–12.

Undaunted, O'Donnell now argues that these conclusions by the trial court are erroneous, relying on a new theory based on the principles of dual agency. O'Donnell contends that Oliver was not only an agent for CBS, but was simultaneously his agent with respect to his personal items locked in the credenza. O'Donnell claims that Oliver had access to the credenza only as his personal agent, and that Oliver was never given consent to enter the credenza as an agent of CBS. Therefore, O'Donnell argues, CBS unreasonably intruded upon his seclusion.

█ There are several problems with this argument, but we will address only the most obvious so that we do not stray too much farther afield from the issue at hand. Undermining O'Donnell's theory is the fact that a dual agent acts for both principals at the same time. *Adams v. Larson*, 116 N.E. 658 (Ill.1917); *Lautz v. Pier V*, 68 Ill.App.3d 290, 24 Ill.Dec. 901, 908, 386 N.E.2d 105, 112 (1979).[2] Therefore, once O'Donnell admits that Oliver was a dual agent of both CBS and himself, he cannot claim that she had access to his credenza only as his personal agent. Because Oliver was also acting as an agent for CBS under a dual agency theory, she also had access to the credenza in this capacity and the district court's reasoning once again applies.

But we are not quite done yet. O'Donnell posits a final argument to back up his

---

**2.** Thus, a dual agent owes a number of fiduciary duties to each principal at all times, including the duty to inform each principal of facts which may be valuable to the principal. *See* Restate-

ment (Second) of Agency, § 381. The disclosure requirement *is designed to make each principal aware of the fiduciary duties a dual agent owes to the other principal.*

dual agency theory based on principles of ratification and respondeat superior. These arguments are essentially reformulations of the vicarious liability and dual agency arguments already presented and rejected. Therefore, without further ado, we also reject this argument.

For the reasons stated above, the district court's grant of summary judgment in favor of defendant CBS is hereby

AFFIRMED.