**NAVIERA DESPINA, INC., and Globomar Marine Services of Louisiana, Inc., Plaintiffs,**

v.

**COOPER SHIPPING COMPANY, INC., and Marine Bulk Carriers, Inc., Defendants.**

**Civ. A. No. 85–0080–T.**

United States District Court, S.D. Alabama, S.D.

April 3, 1987.

On Motion for Amendment of Judgment April 14, 1987.

Joe E. Basenberg, Douglas McCoy, Mobile, Ala., for plaintiffs.

M. Kathleen Miller, Donald C. Radcliff, Mobile, Ala., for defendants.

DANIEL HOLCOMBE THOMAS, District Judge.

This admiralty case was heard on December 17–19, 1986. It arises out of the carriage of certain cargo aboard the M/V DESPINA V from Mobile to Castries, St. Lucia; Bridgetown, Barbados; and Port of Spain, Trinidad in November and December 1983. Stated briefly, on November 4, 1983,

Globomar Marine Services of Louisiana, Inc. chartered the M/V DESPINA V to Caribbean Marine, Inc. on FIOS charter terms. Caribbean Marine then subchartered the vessel to Marine Bulk Carriers, Inc. on a liner term fixture. When Caribbean Marine breached the head charter with Globomar by failing to pay charter hire, dead freight and demurrage charges to Globomar, Globomar invoked the arbitration provision of that contract and obtained an arbitration award against Caribbean Marine. Globomar then sued both Marine Bulk Carriers and Cooper Shipping Company.

After this lawsuit was filed, Globomar and Caribbean Marine settled the dispute between them for $55,000.00. Shortly before trial, the Court granted Marine Bulk Carriers' motion for summary judgment, upholding the validity of the subcharter between Caribbean Marine and Marine Bulk Carriers and the actions of Marine Bulk Carriers during the course of shipment. The remaining issue to be determined is whether Cooper Shipping Company improperly purported to act as agent for both Marine Bulk Carriers, Inc. and Globomar Marine Services in a potential conflict of interest situation and then abandoned Globomar when conflict arose. After due consideration of the testimony of the witnesses and the documents submitted, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff, Globomar Marine of Louisiana, Inc. (hereafter Globomar), is a Louisiana corporation and at all times relevant hereto was the operator of the M/V DESPINA V.

2. Plaintiff, Naviera Despina, is a Panamanian corporation and at all times relevant hereto was the owner of the DESPINA V.

3. Defendant, Cooper Shipping Company (hereafter Cooper), is an Alabama corporation doing business as agent for vessels, vessel owners and charterers.

4. Caribbean Marine Shipping and Chartering, Inc. (hereafter Caribbean) is a corporation of a state other than Alabama, and at all times relevant hereto was a vessel broker and charterer.

5. Phoenix Shipping Company of Houston (hereafter Phoenix), is a vessel broker and at all times relevant hereto, was a broker for the DESPINA V.

6. Marine Bulk Carriers (hereafter MBC) is a shipper of cargo, vessel owner and vessel charterer.

7. DESPINA V is the vessel at issue in this litigation.

8. Stelios Vomvas, at all times relevant hereto, was the President of Globomar and Naviera Despina.

9. Carlos Gonzales, at all times relevant hereto, was second in command for Globomar.

10. Barry Scott, at all relevant times hereto, was a principal of Caribbean.

11. Harry Stott, at all times relevant hereto, was employed by Phoenix.

12. Chuck Knight, at all times relevant hereto, was employed by MBC.

13. Mike Hackmeyer, at all times relevant hereto, was Vice President of Cooper.

14. Roma Willis and Larry Brown, at all times relevant hereto, were employees of Cooper.

15. On or about September 2, 1983, the DESPINA V arrived in Mobile.

16. When the DESPINA V arrived in Mobile, there is no dispute that Cooper was requested to act as agent for the DESPINA V; however, there is some dispute as to what kind of agent Cooper agreed to be. Cooper acted as agent for Globomar until the vessel was loaded with cargo and departed from Mobile.

17. Both Larry Brown and Mike Hackmeyer, of Cooper, understood at that time that Cooper was agent for the vessel's operator, Globomar.

18. Larry Brown testified that he dealt with Carlos Gonzales who was second in command for Globomar.

19. Cooper's accounting records indicate that it charged agency fees to Globomar, from the time of the DESPINA V's

arrival in port through the time when she loaded and departed Mobile.

20. At the time the DESPINA V was in Mobile, Barry Scott on behalf of his company, Caribbean, approached Globomar with cargo for the DESPINA V.

21. Scott first proposed this cargo to Globomar on liner terms.[1]

22. This proposal was refused because Globomar did not want to ship any cargo on liner terms. Scott was aware of the basis for this refusal.

23. Subsequently, on November 4, 1983, Globomar and Caribbean entered a charter on FIOS terms.[2] A charter agreement was entered and executed for this charter.

24. MBC regularly transported cargo from the Port of Mobile to the Caribbean during 1983. Cooper acted as agent for MBC in the Port of Mobile. Although it is not clear if Globomar knew this fact.

25. In October 1983, MBC was advised by Cooper of the presence of the DESPINA V in Mobile and its availability for carriage of cargo to the Caribbean.

26. Chuck Knight testified MBC was advised by Cooper, in the persons of Hackmeyer and Willis, that Cooper was acting as agent for the DESPINA V in Mobile.

27. Cooper put MBC in touch with Caribbean Marine via Barry Scott.

28. On November 4, 1983, after negotiating the FIOS charter with Globomar, Barry Scott, acting on his own behalf, and on behalf of Caribbean, entered a liner charter agreement with Marine Bulk Carriers for the DESPINA V covering the same voyage as Caribbean's charter with Globomar.

29. Knight testified MBC would not have allowed its cargo to have been loaded onto the DESPINA V if they had known Scott had changed from broker to charterer.

30. It is disputed by Cooper, but the Court finds that Globomar was not aware of the Caribbean/MBC charter on liner terms prior to the sailing of the DESPINA V from Mobile. This is evidenced in part, by Defendant's Exhibit 3, a telex from Globomar to Phoenix, copied to Caribbean, in response to Caribbean's telex offering a cargo for the DESPINA V, indicating Globomar's quotation for this charter based on FIOS rates. (e.g. M/T KLB 60.00 (paper) BFT Lumber 78.00, M/T Plywood 50.00). No telex or other documentary evidence was introduced indicating that Globomar had any understanding of the terms of any charter for this voyage on terms other than FIOS. Additionally, both Vomvas and Gonzalez testified they were not aware of any charter on liner terms until after the vessel sailed from Mobile. Plus, if Cooper contends Globomar knew of the conflict prior to sailing, it amounts to an admission that Cooper knew of the conflict between the FIOS and liner charter terms prior to the DESPINA V's Mobile departure, since Cooper was in a better position to know the terms of both charter agreements than either Globomar or MBC.

31. The above-mentioned charters between MBC and Caribbean, and Caribbean and Globomar were both entered November 4, 1983.

32. Prior to the sailing of the DESPINA V, while the vessel was in the Port of Mobile, Cooper charged Globomar agency fees including a $750 fee for the week of November 15 to 23, when the vessel was loading in Mobile.

33. After entering of the FIOS charter party between Globomar and Caribbean, Stelios Vomvas of Globomar sent to Galanos Shipping, a ship supply company in Mobile, two copies of this FIOS charter party for delivery to Cooper Shipping and the Captain of the DESPINA V, respectively.

34. Galanos Shipping received the copies of this FIOS charter party and, as requested, Angelo Siotas of Galanos deliv-

---

1. Liner Terms—A charter on liner terms means that the stevedoring and certain other port expenses are for the owner's account.

2. FIOS (Free in and out) Terms—A charter containing FIOS terms means that stevedoring and certain other port expenses are the responsibility of the charterer.

ered one copy of this charter party agreement to Cooper's Dock office, and one copy to the Captain of DESPINA V.

35. Cooper, in the person of Roma Willis, has denied receiving a copy of this FIOS charter agreement.

36. Based on the weight of credible evidence, the Court finds that Cooper did know or should have known of the Globomar/Caribbean FIOS charter party for the DESPINA V prior to the time the vessel sailed. This finding is supported by Globomar's November 22, 1983, telex to MBC, which was sent by MBC to Cooper. This telex, sent the day before the DESPINA V sailed from Mobile, discussed St. Lucia cargo on the same terms as other cargo covered by the November 4, 1983, FIOS charter party: "Port expenses, agency fees and other owner expenses at port not for owner's account."

37. The Court also notes that on November 25, 1983, two days after the DESPINA V sailed, Globomar sent Cooper a telex requesting a port log/statement of facts. This telex advised Cooper that this document was needed so that Globomar could calculate its "lay days".[3] Cooper's President for overseas shipping, Mike Hackmeyer, admitted that "lay days" were not relevant to a liner term charter. By this notice, Cooper if it did not already, should have realized by Globomar's inquiry that they believed they had a charter on some terms other than liner.

38. However, when Cooper received the November 25, 1983, telex indicating Globomar's belief that the charter for the DESPINA V was on FIOS terms, it made no response. Cooper did not react with surprise at Globomar's position that the charter for this voyage was not on liner terms which indicates that it was already aware of the Globomar/Caribbean agreement. Cooper did not send this telex to MBC. Cooper did not immediately advise all par-

ties, in response to this telex, that there was an apparent misunderstanding as to the terms of the charter party for this voyage. This was true even though it was acting as agent for the two parties who were apparently in disagreement.

39. Cooper was given authority to sign the bills of lading for this voyage on behalf of Globomar in a form prepared by Cooper and delivered to Globomar's captain for his signature.

40. This authorization provided that Cooper could sign the bills of lading "without prejudice to the covering charter party."

41. The authorization signed by Globomar's captain bears two handwritten dates, November 18, 1983, and November 22, 1983, which Cooper contends reflects confusion about the charter party agreement referenced by the authorization. However, there is no contention by any party that there was a charter party applicable to this voyage dated either November 18, 1983, or November 22, 1983, the two dates appearing on the captain's authorization. It is agreed by all parties that the only charter agreements made with respect to this voyage are dated November 4, 1983. Here again, however, Cooper made no effort to notify the parties or resolve the confusion it claims to have recognized.

42. The primary dispute in this lawsuit is the nature and extent of Cooper's agency obligation to Globomar. Globomar contends that Cooper was its general agent to do whatever it asked; that by authorizing Cooper to sign bills of lading on its behalf, Cooper was its agent to collect freight under the terms of the FIOS charter agreement.

43. Cooper contends that it was "husbanding"[4] agent only for the DESPINA V and that its only obligation to Globomar was to assist in the movement of the ves-

---

3. "Lay Days" is a trade term for the agreed upon allowance of time for the completion of each operation in the shipping process without the charterers' or their successors' interest incurring any liability. Gilmore and Black, *The Law of Admiralty*, 211 (2d Ed.1975).

4. A "ship's husband" or a "husbanding" agent is an agent on land, representing the owners of a ship, who attends to the provisioning, repairing and general management of a vessel while in port. *Webster's New International Dictionary of the English Language*, 2316 (2d Ed.1951).

sel, the management of the vessel's crew, and other general ministerial tasks.

44. It is undisputed, however, that Cooper never advised Globomar that it was only acting as a "husbanding" agent for Globomar. The agency bills sent to Globomar by Cooper did not indicate any limitation in agency status.

45. Cooper presented testimony that in a back-to-back charter situation, MBC and Caribbean would have the right to appoint agents and that if Cooper was appointed agent by both, Cooper would collect freight for MBC and Caribbean, then Globomar would look to Caribbean, not Cooper, for payment of the money it was owed.

46. Cooper's actions, however, clearly reflect that it was Cooper's understanding of this situation that it was supposed to pay freight to Globomar. Globomar contends that Cooper knew that it was supposed to collect freights for Globomar. The actual behavior of Cooper supports this contention. On November 30, 1983, Cooper communicated with MBC for the first time regarding estimated disbursements for the DESPINA V voyage. The following day, December 1, 1983, Cooper sent this same projection, not to Caribbean, but directly to Globomar. This telex advised that Cooper had wired $9,800.00 for Globomar's account in Barbados and was in the process of collecting the remaining freight.

47. Cooper sent Globomar another telex later on this day stating: "Re msg sent to you earlier-should read in part as follows: Have wire transferred $9800.00 to Barbados to cover full liner terms as per charter party for your account. These expenses cover stevedoring, landing charges, port expenses, etc. as per charter party for your account."

48. By this telex, Globomar alleges it became aware for the first time that there was a liner terms charter and that Cooper intended to disburse freights collected on liner terms, i.e. after deduction of stevedoring expenses, landing charges, port expenses, etc.

49. Globomar responded to Cooper's telex on the same day it was received, as follows: "Re bills of lading kindly advise under whose authority did you sign liner bills of lading. As per master's authority you have been authorized to sign bills of lading on behalf of master and in accordance with the governing charter party. Re your telex of today owners do not recognize charter party between Globomar Marine Services, Inc. and Marine Bulk Carriers as no such fixture exists. Accordingly owners not responsible for loading, discharging expenses. You are not to remit any funds to the discharging ports on behalf of the owners. Owners hereby hold you fully responsible for any and all damages, expenses and legal defense due to your failure to comply with masters authority and sign charter party bills of lading instead of full liner bills of lading."

50. Cooper did not respond to Globomar after receipt of this telex, but immediately sent a copy of it to MBC. Cooper ignored Globomar's order not to disburse any additional funds to the discharging ports and choosing to follow MBC's orders administered freights collected according to liner terms. Although clearly aware that it had received conflicting orders from its two principals, Cooper never reported the conflict to Globomar and never acknowledged to Globomar that it was choosing to follow the instruction of MBC and to ignore the instruction of Globomar. Cooper then proceeded to disburse practically all funds collected just as it normally did with the MBC-owned ship it handled, including making payments to its own stevedoring arm on December 14 in an amount exceeding $20,-000.00, to itself on January 3, 1984, for "commission" and to itself on December 28, 1983, for agency fees charged to Globomar.

51. Based on all the evidence presented, the Court finds that Cooper was obligated as Globomar's agent for the collection and payment of freight on this voyage to Globomar under the FIOS terms of the Globomar/Caribbean charter. Also, the Court finds Cooper had a duty to follow Globomar's instruction in its December 1, 1983, telex; or, at the very least, to report the conflicting instructions promptly to both

parties, not just to MBC, and to not make any further disbursements until the problem was resolved.

52. Much of Cooper's evidence in this lawsuit involved the difference between freight rates under a liner charter as compared to a FIOS charter. There is no dispute that there is such a difference. However, there is no evidence that Globomar knew that liner rates were being charged. Quite to the contrary, even after the sailing of the DESPINA V, Globomar made its claim for freight monies owed based on FIOS rates.

53. The fact that freights were paid to and collected by Cooper on liner rates only establishes Cooper's awareness of the MBC charter agreement with Caribbean. It does not mean that Cooper was not aware of the Globomar/Caribbean charter and of the amount due Globomar under that charter.

54. If freight had been collected and disbursed according to Globomar's charter agreement for the cargo that was actually loaded on the vessel, Globomar would have received $21,043.58 after authorized deductions had been made.

55. After disagreements regarding this voyage arose, Globomar exercised its right to compel Caribbean to arbitration under the charter party arbitration provision.

56. At the conclusion of arbitration, the panel found unanimously in Globomar's favor awarding it full freight due in the amount of $21,043.58, deadfreight in the amount of $40,485.15, and detainage damages of $2050 per day from December 16, 1983, to the date Globomar was ultimately paid its freight due in the amount of approximately $98,000.00. (Although the freight was not paid, the damage awarded for delay was eventually reduced to a sum certain, the reasonableness of which was not challenged).

57. This award was affirmed by the United States District Court for the Eastern District of Louisiana.

58. Cooper was not a party to the arbitration agreement between Globomar and Caribbean and thus was not a party to this arbitration.

59. As a result of Caribbean's financial problems, Globomar compromised its $163,000 judgment against Caribbean for $55,000 consisting both of cash and a personal and corporate note by Barry Scott. The evidence at trial was that Scott has not been making payments toward the $55,000 settlement regularly, having paid to date of trial, $18,000.00.

60. Under the liner term charter, the freight earned essentially equalled approved expenses; whereas, under the FIOS term charter Globomar would have made $21,043.58 in profit after authorized deductions had been made. There would have been no reason for Globomar to have entered a liner term charter.

61. Cooper collected agency fees from both Globomar and MBC because of this voyage, as well as over $20,000 for its own stevedoring branch for loading the cargo in Mobile.

62. The settlement negotiated between Globomar and Caribbean does not release any other party to the transaction at issue in this litigation.

63. The DESPINA V was lost at foreclosure due to this controversy.

64. If any of these Findings of Fact constitute Conclusions of Law, they are hereby adopted as both.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over this admiralty action by virtue of 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

2. Federal maritime law embraces the general principles of agency. *Port Ship Service, Inc. v. International Ship Management and Agencies Service, Inc.*, 800 F.2d 1418 (5th Cir.1986); *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103 (5th Cir.1985); *West India Industries v. Vance & Sons AMC/Jeep*, 671 F.2d 1384 (5th Cir.1982).

3. Agency is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and

subject to his control, and consent by the other so to act. The one for whom action is to be taken is the principal, and the one who is to act is the agent. *Thomson McKinnon Securities v. Moore's Farm Supply,* 557 F.Supp. 1004, 1011 (W.D.Tenn. 1983); *Restatement (Second) of Agency* § 1 (1958). Moreover, the relationship of principal and agent is created either by express or implied contract, or by operation of law. *Valley View Cattle Co. v. Iowa Beef Processors, Inc.,* 548 F.2d 1219 (5th Cir.1977).

4. Cooper's conduct displayed the existence of a principal/agent relationship between Globomar and Cooper. Specifically, Cooper charged Globomar agency fees for the time period in which the M/V DESPINA was in the Port of Mobile to the time of the vessel's departure, performed services for those fees and collected freight, thus displaying the agency relationship existing between Globomar and Cooper. *See generally Interocean Shipping Co. v. National Shipping & Trading Corp.,* 523 F.2d 527 (2d Cir.1975); *B.D. Marchessini & Co. v. Pacific Marine Corp.,* 227 F.Supp. 17 (S.D. N.Y.1964); *Pinaud v. DAMPSKSLSK DANIA A/S,* 122 F.Supp. 51 (S.D.N.Y.1954)

5. An agent must not, except where the principal has full knowledge and gives consent, assume any duties or enter into any transaction concerning the subject matter of the agency in which he has an individual interest or represents interests adverse to those of his principal. *Amoco Production Co. v. Jacobs,* 746 F.2d 1394, 1400 (10th Cir.1984). It is wrong, except where there is full disclosure and consent, for an agent to attempt to serve two masters with differing interests. *Maryland Casualty Co. v. Conner,* 200 F.Supp. 647, 652 (E.D.S.C.1961); *See also, Restatement (Second) of Agency,* §§ 391, 394 (1958).

6. The principal-agent relationship is fiduciary by nature and imposes a duty of loyalty, good faith and fair dealing on the agent. The fiduciary relationship arises not only from a formal principal-agent contract, but also from informal relationships of trust. *Detroit Lions, Inc. v.*

*Argovitz,* 580 F.Supp. 542, 547 (E.D.Mich. 1984).

7. As agent for Globomar, Cooper had an affirmative duty to notify Globomar that Cooper was acting as agent for MBC, thus creating a conflict of interest with its representation of Globomar, and Cooper also had a duty to advise Globomar that a charter existed between MBC and Caribbean that conflicted with the Globomar/Caribbean charter. A dual agent owes a number of fiduciary duties to each principal at all times, including the duty to inform each principal of pertinent facts. *O'Donnell v. CBS, Inc.,* 782 F.2d 1414, 1420 (7th Cir.1986); *Amoco Production Co. v. Jacobs,* 746 F.2d 1394, 1400 (10th Cir.1984). Cooper breached its duty to Globomar by not disclosing the existence of the conflicting charter to Globomar and by not disclosing that it was also the agent of MBC. Cooper further breached its fiduciary duty to Globomar by solely informing MBC, and not informing Globomar of the existence of the conflicting charter terms and by following MBC's charter provisions at Globomar's expense. By following the charter provisions of MBC, instead of those of Globomar, Cooper's stevedoring branch also profited. MBC was a steady, long-established client of Cooper, whereas Globomar was not.

8. The Court finds Cooper liable to Globomar in the amount of $21,043.58, the sum Globomar lost as a result of Cooper's failure to collect and disburse freights in accordance with the Globomar–Caribbean charter. Cooper, instead, followed the MBC–Caribbean charter which was more profitable to Cooper to follow.

9. A failure to follow instructions by an agent renders the agent liable to the principal for losses in damages proximately flowing from such failure. *Thomson McKinnon Securities v. Moore's Farm Supply,* 557 F.Supp. 1004, 1012 (W.D.Tenn.1983). Where Cooper received conflicting instructions from its principals, Globomar and MBC, and intentionally ignored the instructions provided by Globomar while at the same time following MBC's instructions, Cooper acted at its

own peril and is liable for any losses resulting from its failure to faithfully adhere to Globomar's instructions.

10. Cooper was not a party to the settlement agreement between Globomar and Caribbean, therefore the settlement agreement does not release Cooper from any liability in this case. *See, Billiot v. Sewart Seacraft, Inc.,* 382 F.2d 662, 664 (5th Cir. 1967).

■■■ 11. It is well settled in admiralty that a party incurring loss is entitled to interest from the date of the loss to the date of judgment. *Sabine Towing & Transportation Co., Inc., v. Zapata Ugland Drilling, Inc.,* 553 F.2d 489, 490 (5th Cir.1977); *Alcoa Steamship Co., Inc. v. Charles Ferran & Co., Inc.,* 443 F.2d 250, 256; 1971 AMC 1116 (5th Cir.1971). The award of prejudgment interest in admiralty cases may be denied only where particular circumstances make the award of such interest inequitable. *Miller Industries v. Caterpillar, Inc.,* 733 F.2d 813 (11th Cir. 1984); *Noritake Co. v. M/V HELLENIC CHAMPION,* 627 F.2d 724 (5th Cir.1980). In 1977, the Fifth Circuit held that "In admiralty cases the award of pre-judgment interest from the date of loss is the rule rather than the exception." *Complaint of M/V VULCAN,* 553 F.2d 489 (5th Cir.1977). The Court finds for Globomar in the amount of $21,043.58, plus prejudgment interest of 10% per annum from December 1, 1983, to date and post-judgment interest of 5.75% per annum from date of judgment until paid.

12. If any of these Conclusions of Law constitute Findings of Fact, they are hereby adopted as both.

A Judgment will be entered in accordance with these Findings and Conclusions.

### ON MOTION FOR AMENDMENT OF JUDGMENT

Pursuant to the plaintiff's Motion for Amendment of Judgment dated April 13, 1987, this court enters by way of clarifying its original findings of fact and conclusions of law in this matter, the following:

### Additional Finding of Fact

65. This Court after consideration of all the evidence finds there was no causal connection between Cooper's lack of candor and breach of duty due to their conflict of interest and Globomar's alleged loss of other charter opportunities due to the delay of the voyage in question. Globomar did not prove Cooper had anything to do with Globomar not chartering the vessel to Atlas Enterprises or any other potential charter party. The vessel was in Trinidad and could have been tendered to Atlas Enterprises timely if Globomar had not deliberately instructed the Captain not to unload the remaining cargo on the vessel. A plaintiff is under a duty to mitigate damages, which the plaintiff in this instance did not do. The plaintiff is not entitled to recover on their claim for delay in the voyage.

### Additional Conclusion of Law

13. The Court cannot award damages based on a mere hypothetical possibility where there is no apparent causal connection. The plaintiff is not entitled to recover on their $98,000 claim for the delay in the voyage.